## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

NORFOLK COUNTY RETIREMENT
SYSTEM, derivatively on behalf of
SINCLAIR BROADCAST GROUP, INC.,
480 Neponsit Street, #15
Canton, MA 02021

Plaintiff,

vs.

DAVID D. SMITH
1511 Ivy Hill Road
Cockeysville, MD 21030-1417
(Baltimore County)

FREDERICK G. SMITH
7 Timberpark Court
Lutherville Timonium, MD 21093-1111
(Baltimore County)

J. DUNCAN SMITH
1226 Rock Lodge Road
McHenry, MD 21541-1241
(Garrett County)

ROBERT E. SMITH
3600 Butler Road
Reisterstown, MD 21136-4813
(Baltimore County)

HOWARD E. FRIEDMAN
1313 Doves Cove Road
Baltimore, MD 21286-1426
(Baltimore County )

DANIEL C. KEITH
55 South Port Royal Drive
Hilton Head Island, SC 29928-5509

MARTIN R. LEADER
1318 Round Oak Court
McLean, VA 22101-1829

Case No. _____

**JURY TRIAL DEMANDED**

LAWRENCE E. MCCANNA
6155 Shadywood Road, Unit 205
Elkridge, MD  21075-6063
(Howard County)

CHRISTOPHER S. RIPLEY
7343 Brightside Road
Baltimore, MD  21212-1012
Baltimore County,

                                        Defendants

        – and –

SINCLAIR BROADCAST GROUP, INC,
10706 Beaver Dam Road
Hunt Valley, MD  21030
(Baltimore County),

                                Nominal Defendant.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE SUIT ............................................................................................... 1

PARTIES ...................................................................................................................... 4

I.  Plaintiff ............................................................................................................. 4

II.  The Controlling Director Defendants ............................................................... 4

III.  The Director Defendants ................................................................................... 6

IV.  The Officer Defendants ..................................................................................... 7

V.  Nominal Defendant Sinclair Broadcast Group, Inc. ........................................ 8

VI.  Relevant Non-Parties ........................................................................................ 9

JURISDICTION AND VENUE ................................................................................. 10

FACTUAL ALLEGATIONS ..................................................................................... 11

I.  Sinclair Is Controlled by the Smith Brothers ................................................. 11

    A.  The Smith Brothers Exercise Structural Control Over Sinclair ............ 11

        1.  The Smith Brothers Are Controlling Shareholders .................... 11

        2.  The Smith Brothers Occupy Four of Sinclair's Eight Board Seats .......... 12

    B.  The Smith Brothers Exercise De Facto Control over Sinclair .............. 13

        1.  The Smith Brothers Leverage Their Control over Sinclair to Extract Personal Financial Benefits ...................................................... 13

        2.  The Smith Brothers Have Caused Sinclair to Violate FCC Rules ............ 14

II.  The Proposed Merger between Sinclair and Tribune ....................................... 15

    A.  Negotiation of the Merger Agreement .................................................. 16

        1.  FCC and DOJ Rules Regarding Divestiture ............................. 16

        2.  Provisions of the Merger Agreement Concerning Divestiture ................. 18

    B.  Execution of the Merger Agreement ..................................................... 20

6687199.1

III.     Sinclair Sabotages The Merger is Sabotaged to Benefit the Smith Brothers ................... 21

    A.     The FCC and DOJ Antitrust Division Offer Clear Guidance on How
       Sinclair Can Obtain Approval For the Merger — and Sinclair Drags its Feet ..... 21

    B.     Sinclair Proposed Divestiture Trusts That Ignored FCC Guidance ..................... 25

    C.     Attempted Divestitures to Smith Brother Related Entities ................................... 28

        1.     Attempted Divestiture to Cunningham ..................................................... 28

        2.     Attempted Divestiture to Steven Fader ..................................................... 31

        3.     The KUNS-TV, KAUT-TV, and KMYU-TV Divestiture ........................ 33

IV.     The FCC Rejects the Proposed Divestitures ..................................................... 34

V.      Tribune Sues Sinclair for Breach of the Merger Agreement ............................ 40

VI.     Defendants' Actions Described Above Were in Breach of the Company's Code of
    Business Conduct and Ethics ............................................................................ 42

VII.    Sinclair Has Been Harmed ............................................................................... 44

DERIVATIVE ALLEGATIONS ................................................................................. 46

I.      Derivative Standing ......................................................................................... 46

II.     Demand Futility ............................................................................................... 47

    A.     The Smith Brothers' Are Incapable of Discharging Their Duty of Assessing
       Why the Merger Failed and Who is Responsible ................................................. 47

        1.     Decisions Involving the Tribune Merger ................................................. 47

        2.     Other Self-Interested Decisions ............................................................... 50

    B.     The Board is Incapable of Taking Action to Hold the Smith Brothers
       Accountable ........................................................................................................ 51

    C.     Demand Is Futile ................................................................................................ 52

CAUSES OF ACTION ................................................................................................ 53

FIRST CLAIM FOR RELIEF ..................................................................................... 53

SECOND CLAIM FOR RELIEF ................................................................................ 55

PRAYER FOR RELIEF .............................................................................................. 55

6687199.1

JURY DEMAND .......................................................................................................................... 56

6687199.1

Plaintiff Norfolk County Retirement System ("Norfolk" or "Plaintiff"), by its undersigned attorneys, derivatively and on behalf of Nominal Defendant Sinclair Broadcast Group, Inc. ("Sinclair" or the "Company"), files this derivative action against David D. Smith, Frederick G. Smith, J. Duncan Smith, Robert E. Smith, Howard E. Friedman, Daniel C. Keith, Martin R. Leader, Lawrence McCanna, and Christopher S. Ripley ("Defendants") for breaches of their fiduciary duties to the Company and for unjust enrichment.

Norfolk makes the following allegations based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, which are based upon the investigation of its counsel. This investigation included, among other things, a review of the Company's conference calls, announcements, press releases, and filings with the U.S. Securities and Exchange Commission ("SEC") and Federal Communications Commission ("FCC" or the "Commission"), and filings in lawsuits involving Sinclair, as well as news reports and other regulatory findings.

## NATURE OF THE SUIT

1.     This shareholder derivative action seeks to hold Sinclair's controlling shareholders, the members of Sinclair's Board of Directors (the "Board"), and certain Sinclair officers accountable for the damage they caused to the Company, through their efforts to advance the interests of the Smith family — who control Sinclair — to the detriment of Sinclair.

2.     Family patriarch Julian Sinclair Smith founded Sinclair in 1971, when he bought his first television station. Since then Sinclair has become the largest owner of local television stations in the country and a major publicly traded company, with a market capitalization of more than $3 billion and thousands of public shareholders.

1

3.      Despite this major growth, Sinclair has remained under the control of the Smith family — now control over the Company is maintained by Julian Sinclair Smith's four sons — David Smith, Frederick Smith, J. Duncan Smith, and Robert Smith (the "Smith Brothers"). The Smith Brothers maintain their control over Sinclair through their voting control over the Company, by occupying fully one-half of all Board seats, and through personal and financial relationships with the four-non-Smith directors.   The Smith Brothers' structural control over Sinclair also translates into functional control over the Company.   Sinclair routinely enters into transactions with people and entities with close ties to the Smith Brothers.

4.      In 2017 and 2018, the Smith Brothers and the Board were faced with a stark choice between advancing their own personal financial and political interests, and advancing the interests of Sinclair — a test of whether or not they would adhere to their duty of loyalty.   They put their own interests first and are now poised to allow Sinclair to face the consequences.

5.      It began on May 8, 2017, when Sinclair entered into an Agreement and Plan of Merger with Tribune Media Company ("Tribune") in a transaction valued at $3.9 billion (the "Merger" and the "Merger Agreement").   Closing the Merger with Tribune would have been of enormous benefit to Sinclair by increasing its enterprise value to $6.6 billion, achieving a minimum of $650 million in average 2017 and 2018 earnings and a 40% increase in free cash flow and share accretion.

6.      The Merger Agreement required, among other things, that Sinclair divest itself of certain television stations in order to obtain FCC and Department of Justice ("DOJ") Antitrust Division approval of the Merger.   The requirements in the Merger Agreement were consistent with the clear guidance that the FCC and DOJ gave to Sinclair on how to obtain approval of the Merger.   One of these requirements was for Sinclair to divest itself of television stations in 10

-2-

large markets.  Following this guidance would have provided a direct path for FCC and DOJ approval of the Merger.

7.     Rather than follow the regulatory guidance and comply with the Merger Agreement, Sinclair proposed a series of misleading plans that, according to the FCC, included "a potential element of misrepresentation or lack of candor."[1]  The FCC questioned whether Sinclair's proposed divestitures were "shams" because they were to people or entities with very close personal and business ties to the Smith Brothers, and included "sales terms that [were] atypically favorable to the buyers" including sales at below-market prices.[2]

8.     Thus, when faced with the choice of divesting stations in accordance with the Merger Agreement as well as FCC and DOJ requirements or trying to sell stations to parties affiliated with the Smith Brothers at below-market prices, the Defendants chose the latter.

9.     The consequences of this decision are still unfolding.  The FCC designated the Merger for hearing, effectively killing the Merger and preventing Sinclair from achieving the significant benefits that the Merger would have brought.  Tribune withdrew from the Merger Agreement citing Sinclair's breach and filed a lawsuit against Sinclair in the Court of Chancery of Delaware claiming damages of $1 billion.  The Company is also likely to pay significant damages in class actions currently pending under the federal securities and antitrust laws as well as suffer continued reputational harm.

10.     The common denominator to each of these consequences, is that they will be borne by the Company — not directly by the Smith Brothers, and not by the other officers and

---

[1] Hearing Designation Order at 2, *In the Matter of Tribune Media Co. & Sinclair Broadcast Grp., Inc.*, MB Docket No. 17-179 (FCC Jul. 18, 2018) ("HDO").

[2] *Id.* at 1, 6.

6687199.1

directors of Sinclair who did the Smith Brothers' bidding.  The purpose of this suit is to hold those individuals accountable.

## PARTIES

### I.    Plaintiff

11.    Plaintiff Norfolk County Retirement System, established in 1911, provides retirement pension benefits for approximately 10,000 active and retired members from Norfolk County, Massachusetts.  Norfolk has continuously owned Sinclair common stock since at least April 19, 2017, and as of November 27, 2018 owned 21,246 shares.

### II.    The Controlling Director Defendants

12.    David D. Smith ("David Smith"), instrumental in the formation of the Company, has served as Chairman of the Board since September 1990 and as its Executive Chairman since January 2017.  From 1988 until 2017, David Smith served as President and Chief Executive Officer.  David Smith is also a partner of Gerstell Development, LP.   David Smith owns 7,211,072 shares of Sinclair's Class B Common Stock and 11,117,547 shares of Sinclair's Class A Common Stock, conferring to him a total voting percentage of 22.8%.[3]  In addition to his role at Sinclair, David Smith also founded Comark Communications, Inc., a company engaged in the manufacture of high-power transmitters for UHF television station until 1986.  David Smith also served as General Manager of WPMY (Pittsburgh), formerly WCWB-TV, from 1984 until 1986. David Smith currently serves as a member of the Board of Directors of Atlantic Automotive Corporation; the Triscari Group, Inc.; the Sinclair Relief Fund; the American Flag Foundation, Inc.; Cunningham Communications Inc.; and Keyser Investment Group, Inc.  He was also a

---

[3] SEC Schedule 13D, Amendment No. 18 at 7, filed on 10/30/2018 ("13D – Amendment No. 18").

6687199.1

member of the Board of Managers of Alarm Funding Associates, LLC until March 2017. David Smith is a resident of Maryland.

13.     Frederick G. Smith ("Frederick Smith"), has served as Vice President of the Company since 1990 and a Director since 1986. Frederick Smith serves as a member of the Board of Directors or Trustees of the Freven Foundation; Gerstell Academy; University of Maryland at Baltimore Foundation; St. Joseph's Hospital; The Sinclair Relief Fund; Cunningham Communications Inc.; and Keyser Investment Group, Inc. as well as a partner of Gerstell Development, LP and Beaver Dam, LLC. Fredrick Smith owns 4,000,000 shares of Class B Common Stock and 4,060,154 shares of Class A Common Stock of the Company, conferring on him a voting percentage of 12.0%.[4] Frederick Smith is a resident of Maryland.

14.     J. Duncan Smith ("J. Duncan Smith"), has served as Vice President, Secretary, and as a Director of the Company since 1986. Prior to that, he built and operated the following television stations: WPMY in Pittsburgh, Pennsylvania (formerly WCWB-TV); WTTE-TV in Columbus Ohio; WIIB-TV in Bloomington, Indiana; and WTTA-TV in Tampa/St. Petersburg, Florida. He serves as a member of the Board of Directors of the High Rock Foundation; Cunningham Communications Inc.; Keyser Investment Group, Inc.; the Sinclair Relief Fund; and the Boys' Latin School of Maryland, as well as a partner of Gerstell Development, LLP and Beaver Dam, LLC. J. Duncan Smith owns 7,073,466 shares of Class B Common Stock and 7,106,173 shares of Class A Common Stock in the Company, conferring on him a total voting percentage of 21.3%.[5] J. Duncan Smith is a resident of Maryland.

---

[4] *Id.*

[5] *Id.*

15.     Robert E. Smith ("Robert Smith"), has served as a Director of the Company since 1986. Robert Smith served as Vice President and Treasurer of Sinclair from 1988 to June 1998, at which time he resigned from these positions. Prior to 1986, he assisted in the construction of several television stations including WTTE-TV in Columbus, Ohio and also worked for Comark Communications, Inc. Robert Smith serves as a member of the Board of Directors of Nextgen Foundation Charitable Trust; Gerstell Academy; Keyser Investment Group, Inc.; Cunningham Communications, Inc.; Stages Music Arts; as well as a partner of Gerstell Development LP, Beaver Dam LLC, and Laker Partners, LLC. Robert Smith owns 6,474,806 shares of Class B Common Stock and 6,495,458 shares of Class A Common Stock, conferring on him a total voting percentage of 19.5%.[6] Robert Smith is a resident of Maryland.

16.     David Smith, Frederick Smith, J. Duncan Smith, and Robert Smith are brothers.

17.     As controlling shareholders, the Smith Brothers owe to the corporation a fiduciary duty similar to a partner in a partnership, including duties of trust, loyalty, good faith, candor, and due care. It is prohibited for the Smith Brothers to use their position as controlling shareholders of Sinclair to their own advantage and exclude the minority shareholders or the Corporation from the benefits or assets of the Company.

### III.     The Director Defendants

18.     Howard E. Friedman ("Friedman") has served as a Director of the Company since January 2015. He currently serves as the Chairman of the Board of the Union of Orthodox Jewish Congregations of America and serves as a member of the boards of the John Hopkins University Bloomberg School of Public Health; Touro College and University System; Talmudical Academy; and the Simon Wiesenthal Center. Friedman is a resident of Maryland.

---

[6] *Id.*

6687199.1

19.     Daniel C. Keith ("Keith") has served as a Director of the Company since May 2001.  In addition, Mr. Keith is the President and Founder of the Cavanaugh Group, Inc., a Baltimore-based investment advisory firm founded in October 1995.  Currently, he serves as a member of the Board of Trustees of the High Rock Foundation.  Keith is a resident of Maryland.

20.     Martin R. Leader ("Leader") has served as a Director of the Company since May 2002.  Mr. Leader is a retired partner of the law firm ShawPittman (now known as Pillsbury, Winthrop Shaw Pittman LLP) in Washington, D.C., where he specialized in communications law matters.  He is a member of the District of Columbia Bar and a graduate of Tufts University and Vanderbilt University Law School.  Leader is a resident of Florida.

21.     Lawrence E. McCanna ("McCanna") has served as a Director of the Company since July 1995.  McCanna was a shareholder of the accounting firm of Gross, Mendelson & Associates, P.A. and served as its managing director through June 30, 2009.  McCanna is a resident of Maryland.

22.     Defendants Friedman, Keith, Leader, McCanna, and the Smith Brothers (the "Director Defendants"), as directors of the Company were and are required to perform their duties in good faith, in a manner they reasonably believe to be in the best interest of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.  To adhere to these requirements, each Director Defendant owes the Company fiduciary obligations of trust, loyalty, good faith, candor, and due care.  It is further prohibited for the Director Defendants to engage in self-dealing, fraudulent, or grossly negligent misconduct.

## IV.     The Officer Defendants

6687199.1

23.     Christopher S. Ripley ("Ripley") has served as President and Chief Executive Officer of the Company since January 2017.  From April 2014 to January 2017, he served as Chief Financial Officer.  Prior to Sinclair, Christopher Ripley was a managing director at UBS Investment Bank's Global Media Group and served as head of the Los Angeles office, where he managed, advised, and structured various financings and merger and acquisition transactions in the broadcast and entertainment sectors.  Ripley is a resident of Maryland.

24.     David Smith, Fredrick Smith, J. Duncan Smith, Ripley and Fader are referred to collectively as the "Officer Defendants."  The Officer Defendants were and are required to perform their duties in good faith, in a manner they reasonably believe to be in the best interest of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.  To adhere to these requirements, each Officer Defendant owes the Company fiduciary obligations of trust, loyalty, good faith, candor, and due care.  It is further prohibited for the Officer Defendants to engage in self-dealing, fraudulent, or grossly negligent misconduct.

## V.     Nominal Defendant Sinclair Broadcast Group, Inc.

25.     Nominal Defendant Sinclair Broadcast Group, Inc. ("Sinclair" or the "Company") is a Maryland corporation with its principal place of business located at 10706 Beaver Dam Road, Hunt Valley, Maryland.

26.     Sinclair is a publicly traded telecommunications conglomerate that owns and operates, programs, or provides sales services to 191 local television stations across the country in more than 89 markets, many of which are in the South and Midwest.  Sinclair has the largest number of local television stations of any broadcast company in the United States.

6687199.1

27. The Company has two classes of Common Stock. As of October 17, 2018, there were 73,434,756 shares of the Class A Common Stock ("Class A Stock") and 25,670,684 shares of the Class B Common Stock ("Class B Stock") outstanding. The Class A Stock and Class B Stock vote together on all matters, and, in the ordinary course, the Class B Stock is entitled to ten votes per share while the Class A Stock is entitled to just one vote per share.[7] Sinclair's Class A Common Stock trades on the NASDAQ under the ticker symbol "SBGI."

## VI.   Relevant Non-Parties

28. Tribune Media Company ("Tribune") is a Delaware corporation with its principal executive offices in Chicago, Illinois. Its common stock trades on the New York Stock Exchange under the ticker "TRCO."

29. Tribune is a media conglomerate that owns and operates a diverse portfolio of television stations and digital properties. It owns or operates 42 local television stations in 33 markets. It also owns national entertainment network WGN America, digital multicast network Antenna TV, Tribune Studios, WGN-Radio, minority stakes in the Food Network television channel and CareerBuilder employment website, and a variety of real estate assets.

30. Sinclair and Tribune are hereinafter collectively referred to as the "Companies."

31. Cunningham Broadcasting Corporation ("Cunningham") is a privately-owned company headquartered in Baltimore, Maryland that owns broadcast television stations in the United States. Cunningham currently owns and/or operates twenty stations—ten affiliated with Fox, three affiliated with The CW, two affiliated with ABC, and one affiliated with MyNetworkTV. Until January 2018, the mother of the Smith Brothers, Carolyn C. Smith, or her

---

[7] 13D – Amendment No. 18 at 7-8.

6687199.1

estate, owned all the voting stock of Cunningham while the non-voting stock was, and continues to be, owned by trusts for the benefit of the children of the controlling shareholders of Sinclair.

32.     Atlantic Automotive Group ("Atlantic") is a privately-owned business located in Baltimore, Maryland that does business as "MileOne Automotive."  Among other things, the company operates automotive dealerships in Maryland, Pennsylvania, Virginia, and North Carolina.  Steven Fader, a long-time friend of the Smith Brothers, serves as the Chief Executive Officer, President and Member of Atlantic's Operations Committee.[8]  David Smith has a controlling equity interest in Atlantic and serves as a member of its Board of Directors.[9]

## JURISDICTION AND VENUE

33.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

34.     Venue is appropriate within this district under 28 U.S.C. § 1391(b) and (c), because Nominal Defendant Sinclair is incorporated in Maryland and the other Defendants transact business within this district by virtue of their being directors and officers of a Maryland corporation.  Venue is further appropriate because Defendants transact business within this District, and/or have an agent and/or can be found in this District, and because a substantial part of the events giving rise to the claim occurred in this District and a substantial part of property that is the subject of the action is situated in this District. Venue is further proper in this Court pursuant to Md. Code. Ann., § 6-201 because Sinclair is based in and transacts business in this District.

---

[8]  Bloomberg Company Snapshot on Atlantic Automotive Group, *available at* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=4204415.
[9]  HDO at ¶ 11.

6687199.1

35.     This Court has personal jurisdiction over Sinclair and the other Defendants because they have sufficient minimum contacts with the District.

## FACTUAL ALLEGATIONS

I.     **Sinclair Is Controlled by the Smith Brothers**

A.     **The Smith Brothers Exercise Structural Control Over Sinclair**

36.     Sinclair is and always has been a Smith-family enterprise.  Family patriarch Julian Sinclair Smith purchased his first television station in Baltimore, Maryland in 1971.  By 1986 when Sinclair Broadcast Group was formed from its predecessor entities, Julian's son David Smith had a significant role in all aspects of the Company and, over the course of time, the Smith Brothers came to control 75.6% of the voting power of the Company.[10]

37.     The Smith Brothers have each been directors since 1986.  David Smith became Chairman of the Board in 1990 and Executive Chairman beginning in January 2017.  Over the course of time, each of them has served as both a director and employee of the Company.  Frederick Smith became a Vice President in 1990; J. Duncan and Robert became Vice Presidents and Secretary and Treasurer, respectively, in 1988.

1.     **The Smith Brothers Are Controlling Shareholders**

38.     The Smith Brothers beneficially own 96.5% of the Class B Stock, each share of which is entitled to ten votes, and 28.5% of the Class A Stock, each share of which is entitled to one vote.  By virtue of this stock ownership, the Smith Brothers control 75.6% of the combined Class A and Class B votes.

_____

[10] 13D – Amendment No. 18 at 7.

6687199.1

39.     The Smith Brothers are parties to a Stockholders' Agreement, which requires each of them to vote for each of the others in any election for the Board of Directors.[11]   The Smith Brothers have entered into a series of such agreements since at least 1995.   The current agreement does not expire by its terms until 2025.[12]

40.     Based on the foregoing, Sinclair admits it is a "Controlled Company" under NASDAQ listing guidelines and is, therefore, exempt from any requirement that independent directors constitute a majority of the Board.[13]

41.     Because the Smith Brothers have control of Sinclair, they are able to unilaterally elect directors to the Board—regardless of the votes of Sinclair's other shareholders, as well as adopt (or reject) any proposal posed to Sinclair's shareholders for approval.

### 2.     The Smith Brothers Occupy Four of Sinclair's Eight Board Seats

42.     The Smith Brothers occupy four of Sinclair's eight existing Board seats. According to the Amended By-Laws of the Company (the "By-Laws"), a majority of the Board must vote in favor of a proposal before Sinclair can act on it. The By-Laws also provide that a mere majority of the Board constitutes a quorum.[14]

43.     Based on the By-Laws, in any situation in which even one of the outside directors is absent, the Smith Brothers can approve any Company action they choose.   Indeed, it appears that directors regularly miss board meetings.  In 2017, director attendance at Board meetings was 78%[15] and in 2016 it was 88%.[16]  Because of this absenteeism on the part of Board members,

---

[11]  13D – Amendment No. 18 at 7.

[12]  Proxy Statement at 3, filed on May 30, 1996.

[13]  Proxy Statement at 12, filed on April 26, 2018 ("2018 Proxy").

[14]  Form 8-K, Exhibit 3.1 at 1, 4, filed on March 9, 2015 ("By-Laws").

[15]  2018 Proxy at 12.

over the past two-years the Smith Brothers were likely able to adopt any measure put before the Board — even if the other attending Board members opposed.

44.     Further, David Smith, Frederick Smith, and Duncan Smith each have the unilateral power to call for a Special Meeting of the Board of Directors or a Special Meeting of Stockholders.  A quorum for a Special Meeting is five directors.[17]   Thus, if the Smith Brothers call a Special Meeting with the presence of just one outside director, then the Smith Brothers have the unfettered power to approve any measure they choose.

45.     Finally, because the By-Laws require that a majority of the Board must vote in favor of a proposal before it can pass and the Smith Brothers occupy fully one-half of the Board seats, the Board is structurally incapable of approving a measure that is opposed by the Smith Brothers — even measures to hold the Smith Brothers accountable for breaches of their fiduciary duties.

**B.     The Smith Brothers Exercise *De Facto* Control over Sinclair**

46.     In addition to maintaining structural control over Sinclair, the Smith Brothers also have a history of actively using their control to cause the Company and its broadcast platform to advance their personal interests.

**1.     The Smith Brothers Leverage Their Control over Sinclair to Extract Personal Financial Benefits**

47.     In just the last three years, Sinclair has entered into several agreements with entities in which the Smith Brothers have an interest.  For example:

48.     Sinclair leased "certain assets" from entities owned by the Smith Brothers from at least 2015-2017, for a total of $15.3 million.   Capital leases related to these relationships

---

[16] Proxy Statement at 16, filed on April 21, 2017 ("2017 Proxy").

[17] By-Laws at 4.

6687199.1

required payments of $14.2 million and $17.8 million as of December 31, 2017 and 2016, respectively.   In addition, Sinclair leases aircraft owned by the Smith Brothers for which it incurred expenses of $1.9 million in 2017 and $1.4 million in 2016.[18]

49.   In addition to the above-described leases, the Smith Brothers have caused Sinclair to enter into transactions with Cunningham, controlled by the Smith Brothers, at terms advantageous to Cunningham but not to Sinclair.

50.   For example, Sinclair has "unconditionally and irrevocably" guaranteed $45 million worth of Cunningham's debt and purchased assets and paid various fees to Cunningham totaling at least $36.8 million over the last three years.   The Company additionally owes $53.6 million to Cunningham in connection with these asset purchases.[19]   Each of these payments primarily benefits the Smith Brothers or their children.

51.   Moreover, all but one of the Cunningham television stations are operated by Sinclair under so-called local marketing agreements.

52.   These transactions each represent transfers of benefits from the publicly traded Sinclair to the private interests of the Smith family, who own and control Cunningham.

### 2.   The Smith Brothers Have Caused Sinclair to Violate FCC Rules

53.   The Smith Brothers have previously used Cunningham not just to line their pockets but to engage in sham transactions intended to circumvent FCC regulations.

54.   In 2001, Cunningham and Sinclair were fined $40,000 by the FCC in connection with the acquisition of a series of television stations from Sullivan Broadcasting in 1999.[20]   The

---

[18]Form 10-K at F-39, filed on March 1, 2018 ("2017 10K").

[19] *Id.* at F-39-40.

[20]Memo Op. & Order & Notice of Apparent Liability at ¶¶ 27, 1, *In re Matter of Edwin L. Edwards, Sr. & Carolyn C. Smith*, No. 01-336 (FCC Dec. 10, 2001).

6687199.1

FCC concluded that Cunningham, then known as Glencairn Ltd., "passively permitted Sinclair to dictate the terms and conditions of the deal" and was *de facto* controlled by Sinclair.  As a result of the transaction, which was ultimately approved, the Smith family owned 100 percent of the voting power of Cunningham and 90 percent of the non-voting equity.[21]

55.     Five years later, in July 2016, the FCC entered an order requiring Sinclair to pay a $9.5 million fine, related to: (i) Sinclair's violation of FCC rules concerning Sinclair's ownership or control of more than one station in certain designated market areas ("DMA"s); (ii) allegations that Sinclair distorted and/or intentionally aired false news events or stories; and (iii) Sinclair representing 36 non-Sinclair stations in retransmission consent negotiations — in violation of a statutory prohibition, among other things.[22]

56.     On December 21, 2017, the FCC proposed a $13.4 million fine against Sinclair for "failing to make required disclosures in connection with programming sponsored by [a] third-party."[23]   Under the rule, the FCC requires a television station to make an announcement to its viewers regarding the sponsorship of an aired program.[24]   The purpose of this rule is to prevent paid content from masquerading as news.   Nevertheless, Sinclair aired paid programming, sponsored by individuals or entities and failed to disclose the identities of those sponsors to its viewers.[25]

## II.     The Proposed Merger between Sinclair and Tribune

---

[21] *Id.* at ¶¶ 3, 35.

[22] Order and Consent Decree, *In the Matter of Sinclair Broadcast Group, Inc.*, DA No. 16-856 (FCC Jul. 29, 2016).

[23] Press Release, FCC, ***FCC Proposes to Fine Sinclair Broadcast Group Over $13 Million for Violations of Sponsorship ID Rules:*** *Paid Programing Must Include Proper Disclosures When Broadcast* at 1 (Dec. 21, 2017).

[24] *Id.*

[25] *Id.*

6687199.1

### A.   Negotiation of the Merger Agreement

57.   From October 2016 through January 2017, representatives of Sinclair and Tribune met periodically to discuss potential station swaps, partnerships, joint ventures, and other strategic alliances.  These discussions led to an initial indication of interest from Sinclair to purchase Tribune for $32.90 per share.[26]

58.   After significant additional negotiation, which included competing bids from another suitor, Sinclair increased its offer for Tribune to $43.50 per share.  The sale would be a split between cash and stock, revised to be approximately $35.00 to $35.50 per share in cash and an amount in Sinclair Class A common stock that would be valued at between $8.00 and $8.50 per share at the closing price for shares of Sinclair's Class A common stock on May 5, 2017.[27]

59.   In addition to the financial terms of the Merger, Sinclair and Tribune negotiated over the content of the Merger Agreement.  Many of the key aspects of the Merger Agreement related to certain divestitures that would be required as part of the Merger—necessary to obtain FCC and DOJ approval for the Merger.  These approvals were both required and very uncertain because Sinclair owns the largest number of local television stations of any media company across the United States and Tribune also owned numerous television stations.

### 1.   FCC and DOJ Rules Regarding Divestiture

60.   Since its inception, the FCC has enacted policies that discouraged monopolization in the broadcast industry and encouraged diversity of viewpoints.  In addition to promoting diversity, the FCC aims to promote localism and competition in the broadcasting industry.  To

---

[26] Form S-4, Amendment No. 1 at 58-59, filed on August 15, 2017.

[27] *Id.*

6687199.1

accomplish these goals, the FCC (1) sets limits on the number of television stations an entity can own and (2) the national market share of any given entity.

61.    One way it does this is through the so-called "Duopoly Rule" (47 C.F.R. 73.3555(b)), which provides that an entity can own, operate or control, a *maximum* of two television stations in the same market area, so long as at least one of the stations is not a top four station in that market and at least eight independently owned television stations would remain in the market after the proposed combination.

62.    The Duopoly Rule is designed to prevent the monopolization of the airwaves and is predicated on the notion that owning multiple stations in a single market would reduce diversity of viewpoint.  In addition, there is concern that allowing an entity to control several stations would result in monopolization and unfair control of advertising sales in the market.

63.    In addition to the Duopoly Rule, the FCC limits the national market share of television station ownership by a single entity to 39%, pursuant to 47 C.F.R. 73.3555(e)(1) (the "Market Share Cap"):

> ***National television multiple ownership rule.***
>
> No license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent.

64.    As with the Duopoly Rule, the Market Share Cap serves the FCC's policy goals of preventing monopolization and encouraging diverse viewpoints and local competition.

65.    In addition to the FCC rules relating to media mergers, the DOJ Antitrust Division also reviews most proposed transactions under the Hart-Scott-Rodino Act (15 U.S.C. § 18a) and other statutes to make sure that these mergers do not "substantially lessen competition."  With

this authority the DOJ may enter into settlements with the companies involved in the proposed transaction to change the terms of a merger or even take legal action to block a deal from going forward.

66.     These and other rules frequently require that merging companies divest certain stations as part of a merger transaction.

### 2.     Provisions of the Merger Agreement Concerning Divestiture

67.     In its negotiations with Sinclair, Tribune insisted on, and Sinclair agreed to, the Merger Agreement that obligated Sinclair to expedite the regulatory review process and divest stations as required to comply with FCC regulations.[28]   Specifically, the Merger Agreement contained provisions, which went well beyond standard "commercially reasonable efforts" provisions in similar contracts.

68.     Pursuant to the terms of the Merger Agreement, Sinclair was entitled to direct the regulatory process, as is customary for the acquirer[29] and Sinclair agreed to use:

> reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the Merger … as promptly as reasonably practicable …[30]   (emphasis provided)

69.     Section 7.1(a)(ii) of the Merger Agreement required Sinclair to use best efforts and act expeditiously to consummate the Merger which included:

> obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority … that are necessary, proper or advisable to consummate and make effective the Merger[.]

---

[28] Verified Complaint at ¶ 5, *Tribune Media Corp. v. Sinclair Broadcast Group, Inc.*, No. 2018-0593 (Del. Ch. Ct. Aug. 9, 2018) ("Tribune Complaint)"; *see also* Merger Agreement, § 7.1(i).

[29] Merger Agreement, § 7.1(e).

[30] Merger Agreement § 7.1(a).

70.     Moreover, Sinclair's obligation to obtain regulatory approvals as promptly as reasonably practicable was further specified in Section 7.1(i) of the Merger Agreement, whereby Sinclair agreed to:

> use ***reasonable best efforts*** to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur ***as soon as reasonably practicable***[.]

Emphasis added.

71.     In addition, the Merger Agreement attached and incorporated a disclosure letter further defining Sinclair's divestment responsibilities, entitled Schedule 7.1(i), Station Divestitures.  This disclosure letter required, among other things, that Sinclair:

> Subject to Section 7.1 of the Merger Agreement, Parent acknowledges that obtaining regulatory consents required to consummate the transactions contemplated by the Merger Agreement, including, without limitation, the FCC Consent and clearance under the HSR Act, will require the divestiture of certain Stations by Parent or by the Company or by their respective Subsidiaries.
>
> In furtherance of and subject to Section 7.1 of the Merger Agreement, Parent agrees to divest Stations in the following Nielsen "Designated Market Areas" ("DMAs") as necessary to comply with the FCC's Local Television Multiple Ownership Rule, 47 C.F.R. § 73.3555(b), or to obtain clearance under the HSR Act, in each case as required by the applicable Governmental Authority in order to obtain approval of and consummate the transactions contemplated by the Merger Agreement:
>     a. Seattle-Tacoma, WA
>     b. St. Louis, MO
>     c. Salt Lake City, UT
>     d. Grand Rapids-Kalamazoo-Battle Creek, MI
>     e. Oklahoma City, OK
>     f. Wilkes Barre-Scranton, PA
>     g. Richmond-Petersburg, VA
>     h. Des Moines-Ames, IA
>     i. Harrisburg-Lancaster-Lebanon-York, PA
>     j. Greensboro-High Point-Winston Salem, NC
>
> Parent shall designate, at its option, divestiture DMAs and make such Company Station or Parent Station divestitures as may be necessary to comply with the

6687199.1

FCC's National Television Multiple Ownership Rule (the "National Cap"), 47 C.F.R. § 73.3555(e), as required by the FCC in order to obtain approval of and consummate the transactions contemplated by the Merger Agreement…

## B.   Execution of the Merger Agreement

72.   The Merger Agreement was signed on May 8, 2017 by Sinclair's CEO, Defendant Christopher Ripley and Tribune's CEO, Peter M. Kern.   That same day, the transaction was announced in a press release.

73.   Sinclair touted the many benefits that the Merger would bring to the Company. A May 12, 2017 Sinclair Investor Presentation described, in part, how Sinclair would benefit from the Merger:



6687199.1

74.     Even a year later, Defendant Ripley continued touting the Merger benefits in a

May 9, 2018 Earnings Call:[31]

> The combined package is being sold at a 9.7 times multiple of the stations' 2017, 2018 average EBITDA adjusted for market rate network programming costs. The Tribune assets we are keeping are valued at $4.6 billion of enterprise value, of which $2.4 billion pertains to the TV and entertainment assets that are expected to generate $390 million to $410 million of 2017, 2018 pro forma average EBITDA. The final Tribune acquisition reflects an EBITDA multiple of 5.9 times, better than the under 7 times multiple we reported a year ago.  The remaining $2.2 billion of enterprise value includes $500 million of real estate assets held for sale, and $1.7 billion for the TV Food Network stake, which generates approximately $200 million of annual cash flow for Tribune. Furthermore, in a recent 8-K, Discovery valued the Tribune stake in the TV Food Network at $2.1 billion, which would reduce the TV and entertainment multiple further from 5.9 times to 4.9 times.

> The combined Sinclair-Tribune entity post divestitures is expected to generate $1,550,000,000 to $1,575,000,000 of pro forma 2017, 2018 total free cash flow, which on 200 -- or 123 million shares represents an average of $6.35 of annualized free cash flow per share.

75.     The Defendants failed to live up to their responsibilities under the Merger

Agreement and to the detriment of Sinclair—instead partaking in a course of conduct designed to

manipulate the regulatory process and deceive the FCC.  This gambit began almost immediately

after the execution of the Merger Agreement, with the Company, under the control of the Smith

Brothers and the other defendants, repeatedly making proposals that were vague, ambiguous,

deceptive, and/or non-compliant with FCC regulations.

**III.    Sinclair Sabotages the Merger to Benefit the Smith Brothers**

     **A.  The FCC and DOJ Antitrust Division Offer Clear Guidance on How Sinclair
       Can Obtain Approval For the Merger — and Sinclair Drags its Feet**

---

[31]Christopher S. Ripley, Q1 2018 Earnings Call Trs. at 2, May 9, 2018.

-21-

6687199.1

76.     On June 26, 2017, Sinclair submitted its application to the FCC for approval of the Merger, beginning a 180-day process by which the FCC's "Media Bureau" must approve or reject the Merger (the "informal transaction shot clock" or "shot clock").

77.     Almost immediately after the proposed Merger was announced, the DOJ staff made clear that they would have serious concerns about the Merger if Sinclair did not divest assets in ten DMAs (the "10 Overlap DMAs") where both Sinclair and Tribune owned television stations.   These were the very concerns anticipated by the Merger Agreement that Sinclair was required to use its "reasonable best efforts" to resolve.

78.     In light of this information, Sinclair wanted to wait until a new Assistant Attorney General ("AAG") of the Antitrust Division would be confirmed to determine whether his view was consistent with his predecessor's.

79.     The new AAG, Makan Delrahim, took office in September 2017.   Shortly after his appointment, he made clear that, like his predecessor, he too was focused on divestitures in the 10 Overlap DMAs.

80.     On November 15, 2017, fifteen United States Senators sent a letter to the FCC Chairman and the FCC Office of Inspector General ("OIG") raising concerns over mergers involving conglomerates like Sinclair and Tribune where the transaction would lead to a monopoly—thereby weakening the competition in local media markets.   They expressed particular concern over efforts to game the system — like the Smith Brothers' "sham" divestment structure, which allowed Sinclair to surpass the FCC's National Cap on market share of 39%. The Senators demanded that the DOJ to further investigate the details of the Merger in a January 3, 2018 letter, cautioning:

> Sinclair's proposed acquisition of Tribune is an example of the kind of media merger that raises obvious and troubling competitive issues.   Sinclair

Broadcasting is already the largest owner of local television stations in the country. A combined Sinclair/Tribune would own 233 television stations and reach 72 percent of American households, affecting tens of millions of consumers.... [It] deserves the highest level of scrutiny from the DOJ.

81.     On November 17, 2017, the DOJ staff sent a letter to Sinclair explaining that the DOJ's official position was that DOJ's concerns with the Merger could be resolved if Sinclair agreed to divest stations in eight to ten of the 10 Overlap DMAs.[32]

82.     On December 11, 2017, Sinclair pushed back, insisting that it need only divest stations in six of the 10 Overlap DMAs, whereby Sinclair would retain control and interest over three of those "divested" stations. The DOJ rejected this proposal just two days later, proposing that Sinclair divest in at least seven of the 10 Overlap DMAs. Sinclair rejected DOJ's offer out of hand, insisting that DOJ agree to begin settlement discussions on the basis of sales in just three of the 10 Overlap DMAs, or in the alternative, Sinclair threatened to litigate against the DOJ.[33]

83.     In response to this back and forth between Sinclair and the DOJ, on December 18, 2017, Tribune's General Counsel, Edward Lazarus, wrote to Sinclair to express Tribune's "serious concern with Sinclair's approach to obtaining the Department of Justice's clearance." The letter read in relevant part:

The Merger Agreement plainly requires you to accept the Department's offer to clear the transaction in exchange for divestiture of stations in the ten specified DMAs. Accepting the Department's immediate clearance proposal is the only, if belated, path to "enable the Closing to occur as soon as reasonably practicable ...." [] The Department's request that Sinclair agree to divest stations in the ten identified DMAs is precisely and specifically what Sinclair agreed under the Merger Agreement to do. See Parent Disclosure Letter, Sec. 7.1(i) ("[Sinclair] agrees to divest Stations in the following Nielson "Designated Market Areas" …

---

[32] Tribune Complaint at ¶ 64.

[33] *Id.* at ¶¶ 66-67.

6687199.1

as necessary… to obtain clearance under the HSR Act…" [listing the same DMAs identified by the Department]).

***

What we are not willing to countenance … is a continuation on your current path of refusing to accept offered divestiture terms that are clearly within the contemplation of the Merger Agreement and, further, expressing your intention to litigate. Continuing with this approach, ***which will almost certainly precipitate the Department's filing of a complaint in*** the near term, would clearly violate your duties under the Merger Agreement, which, as noted, requires Sinclair to take steps "<u>necessary or advisable to avoid, prevent, eliminate or remove the actual, anticipated or threatened ... commencement of any Proceeding</u> ... that would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the transactions ...."[]

In sum, we urge you in the strongest terms to accept one or the other of the Department's offers: either to obtain clearance immediately by agreeing to divest in the ten specified DMAs or to obtain a pause by agreeing to the terms of the Department's December 13 letter. We would be happy to discuss the path forward further with you.

We look forward to working with you to complete the regulatory process and bring the transaction to a prompt closing.[34]

84.     Despite the clear guidance from the FCC and the DOJ's Antitrust Division, and the warning from Tribune about its failure to adhere to the Merger Agreement, Sinclair dragged its feet for months, insisting that the DOJ and FCC needed to change their policies to adapt to Sinclair's needs, rather than the other way around.   For example, on December 31, 2017, a Sinclair attorney sent an antagonistic letter to DOJ Antitrust Chief Makan Delrahim, noting that the FCC under Chairman Ajit Pai had relaxed ownership rules, but the Antitrust Division had been "unwilling to recognize how completely the world has changed." [35]

85.     On January 25, 2018, Sinclair, Tribune, and Delrahim met, and Delrahim again advised the Companies that the merger would clear if stations were sold in the 10 Overlap

---

[34] Tribune Complaint, Exhibit E at 2-3.

[35] *Id.*, Exhibit H at 2.

DMAs.  Sinclair continued to balk.  Sinclair's counsel responded to Delrahim's statement by telling him to "sue me."[36]

86.     Similarly, Sinclair told Tribune representatives that Tribune would have to sue Sinclair to get them to divest stations in the ten markets proposed by the FCC.  By February 2018, Tribune was reportedly considering suing Sinclair over its failure to submit its divestiture plan to the FCC, a plan that was contemplated by the Merger Agreement.[37]

87.     Subsequently, at a February 13, 2018 meeting at the DOJ, Sinclair continued to press for fewer than 10 divestitures, accusing the DOJ of "completely misunderstand[ing] the industry" and otherwise insulting Assistant Attorney General Delrahim.[38]

**B.     Sinclair Proposed Divestiture Trusts That Ignored FCC Guidance**

88.     Rather than proposing to divest the 10 Overlap DMAs, when Sinclair finally made a formal proposal, it chose to ignore the FCC and DOJ guidance.  Despite knowing that divestiture trusts were disfavored by the FCC, on February 20, 2018, Sinclair proposed placing 23 stations into a divestiture trust (the "First Divestiture Trust Proposal").  Under this plan, Sinclair would use the trust to offer multiple television stations to the public and receive offers which would give it a feel for the values of the television stations.   Since Sinclair, under the control of the Smith Brothers and the other defendants, wanted to wait to see what the market would give as values for the stations, Sinclair was reluctant to give the names of any of the television stations that it would divest to the trust.[39]

---

[36] *Id.* at ¶ 82.

[37] *Id.* at ¶ 83.

[38] *Id.* at ¶ 88

[39] Verified Complaint at ¶ 99.

6687199.1

89.     The FCC warned Sinclair at the time that this stood virtually no chance of approval by the FCC or DOJ.[40]   This type of divestment sale structure had never been approved by the FCC division reviewing mergers in the past thought it might have allowed the Smith Brothers to ensure that certain stations would be sold to their related entities, such as Cunningham or Atlantic.

90.     On February 22, 2018, in a letter to FCC Chairman Pai, Senator Richard Durbin expressed concerns about possible FCC approval of the Merger.  Senator Durbin did not view the First Divestiture Trust Proposal as a truly meaningful divestment.  Instead, he described the proposal as a way to "exploit[] loopholes to skirt the [FCC's] media ownership limits and enable[] Sinclair to continue to dictate content to divested stations ...."

91.     Sinclair's vague divestment proposal caught the attention of NCTA – The Internet & Television Association ("NCTA").[41]   In a February 27, 2018 letter to the FCC, NCTA admonished Sinclair for failing to provide a "'full and complete record' necessary for the public and the [FCC] to evaluate whether the proposed transaction complies with the [FCC]"s media ownership rules ...."   In particular, NCTA complained that Sinclair's submissions to the FCC failed to fully disclose which stations would be divested:

> Sinclair has persistently refused to provide this information, beginning with its initial application through its response to the Media Bureau's information request and now this Amendment. These specifics are essential to understanding the competitive impact of the transaction, including the impact on future retransmission consent negotiations with Sinclair in these markets. Sinclair should

---

[40] *Id.*

[41] NCTA is the principal trade association for the U.S. broadband and pay television industries, representing more than 90% of the U.S. cable market, more than 200 cable networks, and equipment suppliers and providers of other services in the cable industry.

6687199.1

not now be permitted to go forward on the basis of a vague "bigger than a breadbox" promise to comply with the Duopoly Rule ....[42]

92.     Not surprisingly, the FCC staff objected to Sinclair's rather cynical attempt to circumvent regulations and requested amendments to the application, which would have satisfied Sinclair's obligation to divest.[43]

93.     On April 5, 2018, FCC Commissioner Rosenworcel expressed her concern over Sinclair:

> [E]very element of our media policy is custom-built for the business plan of Sinclair Broadcasting.  That is stunning, it is striking, and it looks like something's wrong.  And I'm not the only one to think that.  We're burning down the values of media policy in this agency in order to service this company.[44]

94.     On April 24, 2018, Sinclair withdrew the First Divestiture Trust Proposal, which became a continuing occurrence, as it proposed new transactions that ignored the FCC's clear guidance.[45]

95.     On May 14, 2018, Sinclair submitted another divestiture trust proposal (the "Second Divestiture Trust Proposal").  In this submission, Sinclair proposed to place St. Louis, Missouri stations KNDL-TV and KPLR-TV into a divestiture trust, pending the DOJ's approval of divestiture of another St. Louis station. This proposal again ignored the FCC's and DOJ's guidance.[46]

---

[42] NCTA letter to Marlene H. Dortch, FCC Secretary, in Response to Sinclair Broadcast Group, Inc.'s Feb. 20, 2018 Amendment, *In the Matter of Applications of Tribune Media Co. & Sinclair Broadcast Group, Inc.*, No. 17-179 (FCC Feb. 27, 2018).

[43] Tribune Complaint at ¶ 100.

[44] Karl Bode, *FCC Commissioner Says Her Agency is Now Just a Gian Rubber Stamp for Sinclair Broadcasting*, Techdirt, Apr. 5, 2018.

[45] Tribune Complaint at ¶ 101.

[46] *Id.*

6687199.1

96.     The Second Divestiture Trust Proposal was also later withdrawn.

**C.     Attempted Divestitures to Smith Brother Related Entities**

97.     Between March 3, 2018 and May 14, 2018, Sinclair filed other applications for divestiture—several of which would have indirectly benefitted entities related to the Smith Brothers.

**1.     Attempted Divestiture to Cunningham**

98.     On March 3, 2018, Sinclair filed an application to divest station WPIX-TV in New York to Cunningham for $15 million.[47]

99.     Although Sinclair presented its proposal to sell WPIX-TV to Cunningham to the FCC as a divestment to an unrelated third-party, Cunningham is anything but unrelated to Sinclair and the Smith Brothers.  In January 2018, Carolyn Smith, mother of the Smith Brothers, sold the voting shares of Cunningham to Michael Anderson, the longtime president of Cunningham.[48]  The Cunningham voting shares were sold for a purchase price of $400,000—far below market value—and each of the Smith Brothers retained an option to acquire Anderson's voting shares.[49]  In other words, the transfer of voting shares was illusory.[50]

---

[47] HDO at ¶ 7.

[48] HDO at ¶ 11.

[49] Newsmax Media, Inc.'s Petition to Deny at 9-10, *In the Matter of Applications of Tribune Media Co. & Sinclair Broadcast Group, Inc.*, No. 17-179 (FCC Jun. 20, 2018).

[50] The FCC had previously examined the relationship between Sinclair and Cunningham (previously Glencairn, Ltd.).  In its 2001 decision, the FCC found that Sinclair exercised *de facto* control over Glencairn, in part because Glencairn was ignorant of the most important terms of the deal, demonstrating its lack of involvement in corporate management of Glencairn with respect to the transactions.  In addition, the structure of that transaction would have had Sinclair pay most of the purchase price, allowing Glencairn "to obtain the stations at a small fraction of their value." HDO at ¶ 11, n.22.

6687199.1

100.     In response to Sinclair's proposed sale, an FCC staff member advised Sinclair to instead propose "clean" divestitures, *i.e.*, arms-length sales to truly independent third parties.[51]

101.     While Sinclair withdrew the application to divest WPIX-TV to Cunningham on April 23, 2018, the next day, it doubled down by proposing that two of its high-valued television stations in Texas, KDAF-TV in Dallas and KIAH-TV in Houston, be divested to Cunningham for a combined purchase price of $60 million.[52]

102.     In reviewing the new proposal, the FCC found that "the combined executed sale price [for KDAF-TV and KIAH-TV] was far below the expected market price for [these top network] stations in markets this size, suggesting that the transaction was not arm's-length."[53]

103.     Under Sinclair's proposal, KDAF-TV and KIAH-TV, located in the fifth and seventh largest markets in the nation, respectively, would be sold at a price below the $65 million price for which Sinclair had agreed to sell KPLR-TV, a station located in the twenty-first largest market, to an independent buyer.[54]  Despite the wide gap in the value of the stations, Sinclair proposed to sell both KDAF-TV and KIAH-TV for less than the agreed piece of KPLR-TV.

104.     A bargain skewed so far in Cunningham's favor was only possible because the Smith Brothers, who are both beneficiaries of the Cunningham non-voting trust and controlling members of Sinclair, designed the terms to benefit themselves at the expense of Sinclair.

105.     Further, the relational entanglement between Cunningham and Sinclair expanded. To bankroll Cunningham's liabilities, Sinclair, through the voting power of the Smith Brothers,

---

[51] Tribune Complaint at ¶ 20.
[52] HDO at ¶ 12.
[53] *Id.* at ¶ 25.
[54] *Id.*

6687199.1

authorized Sinclair to jointly, severally, unconditionally, and irrevocably guarantee $53.6 million of Cunningham's debt, as noted in Sinclair's March 31, 2018 Form 10-Q.[55]

106.    This willful disregard by Sinclair, the Officer Defendants, and the Board of Directors of the FCC's request that Sinclair divest the stations to unrelated buyers caused the FCC to conduct a more detailed investigation into the nature of the parties' relationships, further elongating, complicating and jeopardizing the application process.

107.    Indeed, the sale of Cunningham appears to have been a guise for the Smith Brothers to continue to control Sinclair's divested stations.  For example, the sale occurred after months of haggling with the DOJ over which DMAs Sinclair would divest its stations from, and a month before Sinclair eventually agreed with the DOJ to divest stations in the 10 Overlap DMAs.

108.    The intertwined relationship between Sinclair and Cunningham gave the FCC concern as to "whether someone other than the named applicant or licensee is or would be in control" after the station was divested.[56]  Due to the nature of Cunningham's corporate structure and ties to the Smith Brothers, the FCC did not find that the transaction would serve the best interest of the public.

109.    On July 18, 2018, Sinclair withdrew its application to divest the Texas stations to Cunningham.

---

[55] Form 10-Q at 22, filed on May 10, 2018.
[56] HDO at ¶ 15.

-30-

### 2.    Attempted Divestiture to Steven Fader

110.    On April 24, 2018, Sinclair filed a set of applications to divest flagship Chicago station WGN TV LLC ("WGN") to Steven Fader, in his individual capacity, for $60 million.[57] On May 21, 2018, the Commission staff issued a consolidated public notice to solicit public comment on the divestiture applications.[58]

111.    During the public comment period (which ended July 12, 2018), and through a formal *ex parte* presentation, opponents of Sinclair's application challenged the proposed divestitures as "shams" with the purpose of circumventing the local and national television multiple ownership rules.[59]

112.    Through the public comment process, the close relationship between Fader and the Smith Brothers was revealed.  The FCC learned that "Fader not only lacked any prior broadcasting experience, but also has extensive business relationships with David Smith." Fader serves as Atlantic's CEO and President, while David Smith is Atlantic's controlling shareholder and is a board member of Atlantic.  In addition, Atlantic is a Sinclair advertiser and tenant.  Due to this close relationship, Fader cannot be considered independent of the Smith Brothers.[60]

113.    The terms of the proposed transaction between Sinclair and Fader also suggest that the transaction would not have been at arms' length.  Like the proposed divestitures to Cunningham, the proposed divestiture to Fader was at a price far below market value.  By way of comparison, the sale price of WPWR-TV to Fox Television Stations Inc. (a comparable transaction in the same market), in 2002 was $425 million—thus Sinclair was proposing to sell

---

[57] *Id.* at ¶ 10.

[58] Media Bureau Public Notice, *In the Matter of Applications of Tribune Media Co. & Sinclair Broadcast Group, Inc.*, No. 17-179 (FCC May 21, 2018).

[59] HDO at ¶ 11.

[60] HDO at ¶¶ 18-19.

6687199.1

WGN for only 14% of the sale price of WPWR-TV. According to the FCC, "a substantial and material question of fact is presented by Fader's purchase of this station at what appears to be a highly discounted price."[61]

114.   The proposed transaction also presented other questionable deal terms. These included several agreements that would delegate operation of many aspects of the station to Sinclair through various agreements and options. In fact, Fader would handle few, if any, of the station's operations.[62]

115.   The combination of these factors suggested that by divesting to Fader, the Smith Brothers would have retained control over the asset and also personally benefitted financially from the transaction and relationship, particularly because the sale was significantly below market price.

116.   In Senator Durbin's February 22, 2018 letter to Chairman Pai, Sen. Durbin expressed his unease about the sale of stations WPIX-TV to Cunningham and WGN-TV to Atlantic owner and longtime Smith Brother friend Steven Fader. Sen. Durbin emphasized that although the proposal had the appearance of complying with the FCC's National Cap rule, the FCC's approval of the proposed divestiture would allow Sinclair to remotely operate the stations. For example, "Sinclair could still dictate content on these stations, including Sinclair-produced segments," and "be involved in decisions that result in firing local reporters." He urged the FCC to carefully consider the proposed merger.

117.   After reviewing the information provided by, among other things, the comment process, FCC Commissioner Michael O'Reilly found that this combination of factors raised

---

[61] *Id.* at ¶ 20.
[62] *Id.* at ¶ 18.

6687199.1

substantial and material questions as to the real party-in-interest in these divestiture transactions.[63]   The FCC also questioned the sale of such a profitable station to a person without any broadcasting industry experience.[64]   It was problematic to the FCC that Fader would only be purchasing the station license and minimal assets, while Sinclair would hold all the other assets as well as maintain operational control.[65]

### 3.   The KUNS-TV, KAUT-TV, and KMYU-TV Divestiture

118.   On April 24, 2018, Sinclair proposed to divest television stations KUNS-TV in Seattle, Washington; KAUT-TV in Oklahoma City, Oklahoma; and KMYU-TV in St George, Utah to Armstrong Williams ("Williams"), a commentator who has owned and operated Howard Stirk Holdings LLC, a television broadcasting service provider in Washington, D.C., since 2008.[66]   According to Williams, he has maintained a 25-year partnership and friendship with David Smith.[67]

119.   The arrangement between Williams and Sinclair is known as a sidecar arrangement.[68]   Pursuant to the terms of the deal, Sinclair would handle advertising sales and

---

[63] HDO at ¶ 18.

[64] *Id.* at ¶ 19.

[65] *Id.* at ¶18.

[66] *Id.* at ¶ 10; Bloomberg company overview of Howard Stirk Holding, LLC, *available at* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=316113997.

[67] Jason Schwartz, *Armstrong Williams got 'Sweetheart' deal from Sinclair*, Politico, June 13, 2018*, available at* https://www.politico.com/story/2018/06/13/sinclair-broadcasting-armstrong-williams-642997.

[68] According to the FCC website, the sidecar business model involves a dominant and weaker (or, to put it another way, an independent and a dependent) broadcaster in the same market.  The dominant station exercises operational and financial influence over the weaker station and performs the basic functions of station operation.  The typical sidecar business model has three principal components: (1) a joint sales agreement; (2) shared services agreements; and (3) special financial arrangements.  The model is used primarily in markets where one entity would not be allowed to hold more than one television license.  *See* Phil Vereer, *How the Sidecar Business*

offer news programming to the stations, maintain the studios and stations' websites, and pocket up to 30 percent of the monthly net sales revenue from each station.  Similar to other divestment proposals, David Smith created a relationship with the divested entity through which he could continue to influence station operations while reaping the benefits from the revenue stream it collected.  This arrangement appears to have been another attempt to circumvent the FCC ownership rule.  On information and belief, this proposed transaction represented yet another effort by the Smith Brothers to personally benefit from non-arms-length transactions with Sinclair.

## IV.    The FCC Rejects the Proposed Divestitures

120.    On July 16, 2018, FCC Chairman Pai stated that, "based on a thorough review of the record, I have serious concerns about the Sinclair/Tribune transaction,"[69]  Chairman Pai further explained that "the evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law."  He announced that he was circulating a draft hearing designation order regarding the Merger.[70]

121.    In response to the FCC's statement, Sinclair released a statement that the company was "shocked and disappointed today by the news that FCC Chairman Pai was circulating an order proposing to designate our acquisition of Tribune for an administrative

---

*Model Works*, FCC, Mar. 6, 2014, *available at* https://www.fcc.gov/news-events/blog/2014/03/06/how-sidecar-business-model-works.

[69] Hadas Gold, *FCC Chair Expresses 'Serious Concerns' About Sinclair's Bid for Tribune,* CNN, Jul. 16, 2018, *available at* https://money.cnn.com/2018/07/16/media/fcc-sinclair-tribune/index.html.

[70] *Id.*

6687199.1

hearing."[71]  In the statement, Sinclair denied any allegations that it engaged in misrepresentation or lack of candor during the FCC review process.  Instead, Sinclair asserted that it had been completely transparent about every aspect of the proposed transaction—fully identifying the buyers and the terms under which the station would be sold to the buyer.[72]

122.    In response to these developments, Mr. Fader had an *ex parte* telephone conversation with Chairman Pai on July 17, 2018, during which Chairman Pai informed Fader that he disapproved of Sinclair's conduct during the divestment proposal process.[73]  Chairman Pai strongly suggested that if Sinclair did not withdraw the Merger applications in their entirety, it would be subject to a protracted administrative hearing to determine whether its representation to the FCC had been misleading or lacking in candor.[74]

123.    On July 18, 2018, Sinclair running out of options, amended its divestiture plan in response to the FCC's concerns.[75]  It proposed to withdraw the divestiture proposals for KDAF, KIAH and WGN only.  It informed Commissioner O'Reilly that it would keep WGN for itself and work to find an independent buyer or buyers for KDAF and KIAH.[76]

124.    Notwithstanding Sinclair's proposed amendments to withdraw three of the station divestitures, on July 18, 2018, the FCC voted unanimously to refer Sinclair's acquisition of

---

[71] Press Release, *Sinclair Responds to Statement of FCC Chairman Pai on Tribune Transaction*, Jul. 16, 2018, *available at* https://www.prnewswire.com/news-releases/sinclair-responds-to-statement-of-fcc-chairman-pai-on-tribune-transaction-300681750.html.

[72] *Id.*

[73] Tribune Complaint at ¶ 113.

[74] *Id.*

[75] Letter Amendment, *In the Matter of Applications of Tribune Media Co. & Sinclair Broadcast Group, Inc.*, No. 17-179 (FCC Jul. 18, 2018).

[76] *Id.*

6687199.1

Tribune application to an Administrative Law Judge ("ALJ").[77]  On July 19, 2018, the FCC

released the Order to the public.  It found that Sinclair may have violated FCC regulations by

making misrepresentation to the Commission and operating throughout the approval process

without the requisite candor as required by Section 1.17(a)(1) of the FCC's rules:

> No person shall, in any written or oral statement of fact, intentionally provide
> material factual information that is incorrect or intentionally omit material
> information that is necessary to prevent any material factual statement that is
> made from being incorrect or misleading.  We note that a misrepresentation is a
> false statement of fact made with the intent to deceive the Commission.  Lack of
> candor is a concealment, evasion, or other failure to be fully informative,
> accompanied by an intent to deceive the Commission.[78]

125.    The FCC had grave concerns that by failing to fully disclose the pre-existing

business relationship between David Smith and Fader, and all of the entanglements between and

among Cunningham, Sinclair, and the Smith Brothers, Sinclair had violated Section 1.17(a)(1) of

the FCC's rules.[79]  Therefore, the FCC concluded,

> There is a substantial and material question of fact as to whether Sinclair
> affirmatively misrepresented or omitted material facts with the intent to
> consummate this transaction without fully complying with our broadcast
> ownership rules.[80]
>
> *      *      *
>
> Since there were substantial and material question of fact regarding whether
> Sinclair was the real party-in-interest to the stations and there were questions of
> whether Sinclair had engaged in misrepresentation or lack of candor in its
> application with the Commission the applications would be designated for a
> hearing pursuant to Section 309(e) of the Act.[81]

126.    Generally, when the FCC issues a hearing designation order assigning a matter to

an ALJ for an administrative hearing, it signals the end of the proposed merger.  As one former

---

[77] HDO at ¶ 29.

[78] HDO at ¶ 28.

[79] *Id.*

[80] HDO at ¶ 28.

[81] *Id.* at ¶ 27.

6687199.1

Commissioner has stated, "Mergers are never put to hearing in order to approve them ... they are designated for a hearing in order to kill them.[82]  In addition, in a statement made in the FCC Order released July 19, 2018, one FCC Commissioner referred to an administrative hearing referral as "regulatory purgatory" that is "a de facto merger death sentence."[83]

127.   Often the Commission's designation of an application for a hearing leads to the withdrawal of the application, as was the case in several recent high-profile mergers.[84]  The reason these applications are withdrawn is due to uncertainty over the duration that a hearing of this kind may take as well as uncertainty over the outcome of the process.[85]

128.   On July 19, 2018, Senator Durbin commended the FCC on subjecting the Merger to heightened legal review and scrutiny in a letter to Chairman Pai.[86]  In the letter, Senator Durbin expressed his concerns for the proposed Merger.  He stated his concerns were based on, "Sinclair's worrisome business practices and the threat the deal posed to the public interest, localism and diversity, and competition."[87]  He pointed-out that, "Sinclair's record is long when it comes to pushing the interests of local and diverse audiences aside in favor of mandating local stations air Sinclair-produced national content."[88]

---

[82] Alexander Maltas, Tony Lin, & Robert F. Baldwin, II, *A Comparison of the DOJ and FCC Merger Review Processes: A Practitioner's Perspective*, The Antitrust Source, Aug. 2016, at 10.

[83] Tribune Complaint at ¶ 30.

[84] *See, e.g.,* Alexander Maltas, Tony Lin, & Robert F. Baldwin, II, *A Comparison of the DOJ and FCC Merger Review Processes: A Practitioner's Perspective*, The Antitrust Source, Aug. 2016, at 10.  ("In 2011 AT&T-T-Mobile and the 2015 Comcast-Time Warner Cable proposed transactions, in which the parties withdrew their applications upon the FCC staff's recommendation that the transactions be designated for hearing.").

[85] *Id.*

[86] Letter from Senator Richard Durbin to Chairman Pai (Jul. 19, 2018).

[87] *Id.*

[88] *Id.*

129.    Senator Durbin found that "Sinclair sought to exploit every available loophole to avoid complying with existing media ownership limits, including constructing purchase agreements that fail any reasonable test of a meaningful divestment."[89]   The Senator observed that, "Sinclair's recent announcement to submit yet another amended proposal serve[d] as not only acknowledgment that their previous proposals failed to comply with the law, but also proved that it was a deliberate attempt to avoid having to defend these sham purchase agreements before a judge."[90]

130.    On August 3, 2018, responding to Senator Durbin's letter, the FCC stated that the evidence suggested that had the FCC approved the Merger, Sinclair would have maintained control of the divested stations.[91]   Chairman Pai reassured Senator Durbin that the allegations would be resolved.  He replied, "[g]iven the seriousness of the issues presented, the order directs the Media Bureau to hold in abeyance all other pending applications and amendments thereto related to the overall proposed Sinclair-Tribune transaction until the issues that are the subject of this order have been resolved."[92]

131.    On August 8, 2018, Tribune terminated its Merger Agreement with Sinclair.[93]

132.    Later that day, Sinclair withdrew with prejudice its FCC application to acquire Tribune and filed a motion to terminate the approval process.[94]  This action by Sinclair would prejudice it from applying to the FCC for the acquisition of Tribune in the future.

---

[89]  *Id.*

[90]  *Id.*

[91]  Letter from Chairman Pai to Senator Richard Durbin (Aug. 3, 2018).

[92]  *Id.*

[93]  Joe Flint, *Sinclair Terminates $3.9 Billion Merger with Rival Sinclair*, Wall Street Journal, Aug. 9, 2018, *available at* https://www.wsj.com/articles/tribune-media-terminates-merger-agreement-with-sinclair-broadcast-group-1533810907

6687199.1

133.    Despite Sinclair's attempt to escape the hearing before the ALJ by withdrawing its application, on August 27, 2018, ranking congressional members, Frank Pallone, Jr. and Mike Doyle, appealed to the FCC to continue with the ALJ proceedings.[95]   They encouraged the FCC to investigate and resolve the allegations of misrepresentation by Sinclair.[96]

134.    The Congressmen further urged the Chairman to direct the FCC's Enforcement Bureau to review Sinclair's conduct in the Merger approval proceeding.   Specifically, they wanted the FCC to examine, "[w]hether Sinclair violated the law prohibiting licensees from making false material statement or omissions to the FCC."[97] The Congressmen emphasized that "it was important for the integrity of the [FCC] that an investigation into Sinclair's alleged misrepresentations and lack of candor be conducted."[98]   They ended the letter by asking Chairman Pai to provide updates on the FCC's activity regarding their request.[99]

135.    Several weeks after the FCC recommended Sinclair's application be referred for an ALJ hearing, the DOJ started to investigate whether Sinclair had violated the antitrust laws by inflating local television advertising prices.[100]   The probe examined whether Sinclair, Tribune

---

[94] Sarah Toy, *Sinclair Broadcast Group withdraws with Prejudice its FCC applications to acquire Tribune Media Co.,* Marketwatch, Aug. 9, 2018, *available at* https://www.marketwatch.com/story/sinclair-broadcast-group-withdraws-with-prejudice-its-fcc-applications-to-acquire-tribune-media-co-2018-08-09.

[95] Letter from Congressmen Frank Pallone, Jr. & Mike Doyle to Chairman Pai at 1 (Aug. 27, 2018).

[96] *Id.*

[97] *Id.*

[98] *Id.* at 2.

[99] *Id.* at 3.

[100] Drew FitzGerald and Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, Wall Street Journal,  Jul. 26, 2018, *available at* https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979.

6687199.1

and other independent TV station owners coordinated efforts when their ad sales team exchanged "competitively sensitive information" with each other, giving them an advantage when negotiating advertising prices with ad buyers.[101] The DOJ sought to understand whether this practice potentially led to higher rates for TV commercials.[102]

136.    While the investigation was pending, various plaintiffs who purchased television advertising filed antitrust class action lawsuits against Sinclair and other broadcasters.   These cases were ultimately consolidated in Illinois and remain pending.   At this time it is unclear the degree of Sinclair's exposure to the pending antitrust class action lawsuits.

## V.   Tribune Sues Sinclair for Breach of the Merger Agreement

137.    On August 9, 2018, Tribune announced that it was terminating the Merger Agreement and filed an action against Sinclair for breach of its obligation and failure to perform its duties identified in the Merger Agreement.[103]

138.    Tribune alleged that Sinclair materially breached its obligations under Sections 7.1(a) and 7.1(i) of the Merger Agreement, which included the: (i) use of reasonable best efforts to take action to avoid or eliminate each and every impediment that could be asserted by any Governmental Authority so as to enable the Merger to close as was reasonably practicable; (ii) use of reasonable best efforts to avoid the entry of any Order that would delay, restrain, prevent, enjoin, or otherwise prohibit consummation of the Merger; and (iii) proffer, agree to, and effect the divestiture of stations as agreed to in the Sinclair Disclosure Letter to prevent or even the

---

[101] Gerry Smith & David McLaughlin, *Sinclair, Tribune Settle Justice Department Probe Over Ad Sales,* Bloomberg, Nov. 13, 2018, *available at* https://www.bloomberg.com/news/articles/2018-11-13/sinclair-tribune-settle-justice-department-probe-over-ad-sales.

[102] *Id.*

[103] Tribune's Complaint at ¶ 127.

6687199.1

threatening commencement of any Proceeding that would prohibit the consummation of the Merger.[104]

139.   According to Tribune, Sinclair had been "engaged in belligerent and unnecessarily protracted negotiations with the DOJ and the FCC over regulatory requirements,"[105] rejecting what Tribune described as "clear paths to regulatory approval."[106] Instead Sinclair "fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell."[107] According to government sources, attorneys in the DOJ's Antitrust Division had been almost immediately put off by the arrogance of the Sinclair team.  Apparently, Sinclair even "went so far as to threaten to file its own lawsuit *against* DOJ."[108]

140.   Tribune also alleged that Sinclair's actions were willful, because Sinclair deliberately failed to act, knowing that doing so would constitute a breach of the Merger Agreement.[109]

141.   Tribune further alleged that it sustained financial harm and losses from the expected benefits of the Merger Agreement and asked the Court to award $1 billion in damages based on the loss of the share premium in the merger by its shareholders, including costs and attorneys' fees.[110]

---

[104] *Id.* at ¶ 138.

[105] *Id.* at ¶ 7.

[106] *Id.* at ¶ 8.

[107] *Id.*

[108] *Id.* at ¶ 12.

[109] *Id.* at ¶ 139.

[110] *Id.* at ¶ 35; Joe Flint, *Tribune Terminates $3.9 Billion Merger with Rival Sinclair*, Wall Street Journal, Aug. 9, 2008.

-41-

## VI. Defendants' Actions Described Above Were in Breach of the Company's Code of Business Conduct and Ethics

142.    On August 3, 2010, the Company adopted its current Code of Business Conduct and Ethics (the "Code of Ethics").[111]

143.    The Code of Ethics prohibits, among other things:

### A. Conflict of interests

It is the policy of the Corporation to prohibit its officers, directors and employees from engaging in any activity or practice in conflict with the interests of the Corporation. All officers, directors and employees must avoid conflicts between their personal interests and the interests of the Corporation in dealing with fellow employees, other organizations, clients, vendors, or individuals seeking to do business with the Corporation. Situations should be avoided where it would be reasonable for an objective observer to believe that the judgment or loyalty of the officer, director or employee may be compromised by his or her own, or an immediate family member's (spouse, parent, child, sibling or domestic partner) external employment. Conflicts of interests can take many forms, not all of which can be detailed in this Code.

                                    ***

Corporation loans to, or guarantees of obligations of, directors and executive officers and their family members are likely to create conflicts of interest and, therefore, are prohibited. In addition, loans to, or guarantees of obligations of, other employees may create conflicts of interest and therefore must be reviewed and approved in advance by the General Counsel and either the Vice President of Human Resources or the Chief Financial Officer.

                                    ***

The Corporation aims to succeed through fair and honest competition. The Corporation seeks superior performance from its officers, directors and employees, but never through unethical or illegal business practices. Officers, directors and employees should endeavor to deal fairly with the Corporation's customers, suppliers, competitors and other employees and directors. No one should take unfair advantage of another individual through manipulation, concealment, abuse of privileged information or misrepresentation of the material facts.

### B. Corporate Opportunities

---

[111]    http://sbgi.net/wp-content/uploads/investor-relations/governance-ethic-docs/SBGI-Code-of-Business-Conduct-and-Ethics-2015.pdf

6687199.1

Officers, directors and employees are prohibited from: (a) taking for themselves personally opportunities related to the Corporation's business; (b) using the Corporation's property, information, or position for personal gain; or (c) competing with the Corporation for business opportunities; *provided however*, if the Corporation determines not to pursue a business opportunity, officers, directors and employees may do so with the consent of the general manager of the station at which such employee is employed or, in the case of an officer or a director, from the Corporation's Chief Financial Officer. The Chief Executive Officer and Chief Financial Officer must obtain authorization to pursue such opportunities from the Board of Directors.

### C. Compliance with laws, rules and regulations

Officers, directors and employees must comply with all laws, rules and regulations applicable to them or the Corporation, including, without limitation, insider-trading laws, antitrust laws, intellectual property laws, anticorruption laws, lobby laws and FCC rules and regulations.

144.    The Smith Brothers violated each of these provisions of the Code of Ethics.  They caused Sinclair to provide loans and guarantees to companies owned by themselves and their family members; they engaged in unfair business competition through their violation of the antitrust laws; they took for themselves and their associates assets and opportunities of the Company at non-arms-length terms and prices; and they misled the FCC and DOJ in an effort to flout FCC ownership rules.  These were each in violation of the Company's Code of Ethics.

145.    The Code of Ethics creates a set of disciplinary action for violations, which include:

When Code violations are determined to exist, appropriate corrective and disciplinary action will be taken, which may include one or more of the following measures, as applicable: (i) counseling; (ii) a warning; (iii) a reprimand noted in the employee's personnel file; (iv) probation; (v) change, including reassignment, in job responsibilities, authority and/or title; (vi) temporary suspension, with or without pay; (vii) termination of employment or other relationship with the Corporation; (viii) removal as a director or officer; (ix) reimbursement of losses or damages resulting from the violation; or (x) referral for criminal prosecution or civil action.

6687199.1

146.   Accordingly, based on the Code of Ethics, each of the Defendants, but particularly the Smith Brothers should face disciplinary action.  However, based on the Smith Brothers' control over Sinclair, this will not happen.

## VII.   Sinclair Has Been Harmed

147.   Sinclair has been harmed by the Defendants' malfeasance and continues to be harmed.

148.   As an initial matter, Defendants' misrepresentations regarding, among other things, Sinclair's efforts at divesture, has soured its relationship with the FCC—its primary regulator.  Even worse, the FCC referred the matter to an ALJ for adjudication.  If the Judge makes an adverse ruling against Sinclair, such as finding that the company attempted to deceive the FCC, future efforts by the Company to license broadcast stations would be in danger— stopping the Company from expanding its business in the future.

149.   In addition, the Defendants' misdeeds resulted in Sinclair breaching the Merger Agreement and caused Tribune to withdraw from the deal and sue Sinclair in the Court of Chancery of the State of Delaware seeking damages of more than $1 billion.

150.   The failure of the Merger has also caused harm to Sinclair by virtue of the lost value that consummation of the Merger would have brought to the Company in the form of synergies, economies of scale, and future business growth and opportunities.  For example, in describing the benefits of the Merger, Sinclair represented that it would realize "substantial immediate and medium term synergy opportunity" from the deal.  According to Sinclair's CEO, Ripley, "[t]he Tribune stations are highly complementary to Sinclair's existing footprint and will create a leading nationwide media platform that includes our country's largest markets."  Sinclair identified "significant and immediate financial value creation" including: average of at least

$650 million in 2017/2018 EBITDA from its core television business; "implied multiple of less than 7.0x EBITDA on the core television and entertainment business;" and "over 40% average 2016/2017 free cash flow per share accretion."[112]

151.    In addition, on December 3, 2018, Nexstar Media Group, Inc. ("Nexstar") and Tribune announced that they had entered into a definitive merger agreement whereby Nexstar would acquire all outstanding shares of Tribune for $46.50 per share in a cash transaction valued at $6.4 billion including the assumption of debt. This established the current fair value of Tribune.   Sinclair would have purchased these same assets at a significant discount $43.50 per share for an aggregate purchase price of $3.9 billion plus the assumption of approximately $2.7 million in debt.   Thus, Defendants' breaches of fiduciary duty and other malfeasance cost Sinclair at least this difference in value of $3.00 per Tribune share for a total of $200 million.

152.    The failure of the Sinclair – Tribune transaction eliminated these and the other benefits that Sinclair would have, by its own admissions, achieved had the Merger been consummated.

153.    Moreover, the Company's brand has been seriously tarnished by the Defendants' malfeasance and misdeeds, impairing its goodwill.   Potential merger partners will view this episode as a warning that Sinclair does not take its obligations under Merger Agreements or FCC divestiture rules seriously, which would complicate or even doom any future attempts to enter business combinations that would benefit Sinclair and its shareholders.

154.    Recently, some public interest groups have raised the possibility of challenging Sinclair's existing licenses, in light of the FCC's claim that the Company may have

---

[112] *See* Investor Presentation at 2, Sinclair Broadcast Group, Inc. (May 8, 2017).

6687199.1

misrepresented the nature of its merger plans thereby breaking FCC rules requiring that broadcast licensees must be individuals or entities of "good character" in order to hold licenses.

155.    Shortly after Tribune initiated litigation against Sinclair for breaching the Merger Agreement, Sinclair shareholders filed suit against the Company and certain of its executives for violation of the federal securities laws.   That lawsuit alleges damages of an additional $564 million.[113]   The Company is also subject to additional liability resulting from potential judgments or settlements in other litigation.

156.    In addition to the foregoing harm, because of Sinclair's actions to benefit the Smith Brothers, the DOJ Antitrust Division identified additional antitrust violations that have now led to civil suits.   While the cost to Sinclair associated with those civil suits is currently undetermined, they are expected to be substantial.

## DERIVATIVE ALLEGATIONS

### I.    Derivative Standing

157.    Norfolk brings this action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty and other breaches by the Defendants.

158.    Norfolk has owned Sinclair stock continuously since April 19, 2017, which is prior to Sinclair entering into the Merger Agreement with Tribune.   Norfolk has also owned Sinclair stock throughout the time of the wrongful course of conduct by the Defendants alleged herein and continues to hold Sinclair stock.

---

[113] Class Action Complaint, *Komito v. Sinclair Broadcast Group, Inc.*, No. 1:18-cv-02445 (D. Md. Aug. 9, 2018).

6687199.1

159.   Norfolk will fairly and adequately represent the interests of Sinclair and its stockholders in enforcing and prosecuting the Company's rights.   Norfolk has retained experienced counsel to prosecute this action.

## II.   Demand Futility

170.   As described above, each Board member personally breached his fiduciary duties to the Company, such that he is liable to the Company for the losses sustained by the Company as a result of his illegal conduct, as well as securities and/or regulatory actions.   None of the Director Defendants could evaluate a demand in good faith.   Therefore, Plaintiffs have not made a demand on the Board to bring suit asserting the claims set forth herein because pre-suit demand is futile and excused as a matter of law.

### A.   The Director Defendants Are Incapable of Discharging Their Duty of Assessing Why the Merger Failed and Who is Responsible

#### 1.   Decisions Involving the Tribune Merger

171.   As detailed exhaustively herein, in 2017 and 2018 the Smith Brothers were faced with a choice between advancing their own personal interests and advancing the interests of Sinclair in connection with seeking governmental approval of Sinclair's proposed merger with Tribune.

172.   Over the course of many months and given a clear roadmap by the FCC on how to obtain approval for the transaction – a roadmap that was set forth in and required by the Merger Agreement itself – every divestment proposal made by Sinclair and the Smith Brothers involved transactions that would have benefitted the Smith Brothers or their families personally – rather than proposals designed to obtain FCC and DOJ approval of the Merger.   These self-interested

proposals formed the basis for the FCC's issuing a formal hearing designation notice and ultimately the failure of the Merger.[114]

173.    By making these decisions, the Smith Brothers clearly advanced their own personal interests over those of the Company and thereby breached their fiduciary duty of loyalty and violated the Company's Code of Ethics, exposing the Company to very substantial harm. The other Director Defendants, by approving proposals that would benefit the Smith Brothers at the expense of the Company, also breached their fiduciary duties to the Company and demonstrated their inability or unwillingness to question the conduct of the Smith Brothers and hold the Smith Brothers accountable for the complete abrogation of their fiduciary duties to the Company.

174.    Also, as part of the merger transaction and approval process, the Director Defendants likely approved the related party divestitures for the benefit of the Smith brothers. Because the Director Defendants acted for the benefit of the Smith brothers, at the expense of the Company and its minority stockholders, they have acted in bad faith, and therefore face a substantial likelihood of liability.

175.    Moreover, the Director Defendants permitted the Company to engage in self-dealing, related party divestitures in violation of FCC rules. The Director Defendants received repeated warnings from regulators that the Cunningham and Steven Fader divestitures were in violation of FCC rules, but failed to take any corrective action to ensure approval of the Sinclair - Tribune merger transaction. The Director Defendants signed the Company's public filings, which described Cunningham and Atlantic Automotive as "related persons." The Director Defendants had knowledge of previous FCC enforcement actions in which the federal regulator

---

[114] Tribune Complaint at ¶¶ 122-123.

found that the Company had exercised *de facto* control over Cunningham and found certain sidecar arrangements violative of FCC rules. Most importantly, the Director Defendants were specifically warned by FCC to amend the proposed divestitures to make sure that greater separation existed between Sinclair and the buyer. Rather than heed these warnings, the Director Defendants permitted Sinclair to divest two different stations to the same buyer – Cunningham – knowing full well that the FCC would not approve the divestiture.

176.   Rather than heeding the FCC's guidance and warnings, the Director Defendants caused the Company to submit materially false or misleading statements to the FCC in connection with the Sinclair-Tribune merger transaction.  The Director Defendants failed to include all facts known to the Smith brothers and the Company regarding Sinclair's – more specifically, the Smith brothers' – close business ties to Cunningham and Steven Fader. Further, the Director Defendants failed to disclose the financial relationship between Sinclair and the Smith brothers and Cunningham and Steven Fader. Ultimately, the FCC found that the Company may have engaged in deception and materially misled the FCC by failing to disclose these facts, resulting in the FCC issuing the hearing designation order.

177.   Finally, the Director Defendants consciously permitted the Company to breach the Merger Agreement by failing to use reasonable best efforts in seeking approval of the Sinclair-Tribune merger transaction. As discussed herein, the Director Defendants permitted the Company to engage in sham divestitures and make materially false statements to the FCC. As a result of these activities, Tribune brought suit in Delaware Chancery Court claiming that Sinclair breached the Merger Agreement and seeking $1 billion in damages. The Company did not move to dismiss the Complaint, but rather immediately submitted an answer. The litigation is currently in discovery.

178.     Thus, because of their actions in connection with the Sinclair – Tribune merger transaction, each of the Director Defendants face a substantial likelihood of liability for acting in bad faith by pursuing the interests of the Smith Brothers at the expense of the minority stockholders and failing to oversee the Company's compliance with contractual provisions and federal law.

### 2.     Other Self-Interested Decisions

179.     Moreover, Sinclair has entered into several lucrative agreements with entities in which the Smith Brothers have an interest.  Sinclair leased "certain assets" from entities owned by the Smith Brothers from at least 2015-2017, for payments totaling of $15.3 million.  Capital leases related to these relationships resulted in payments of $14.2 million and $17.8 million as of December 31, 2017 and 2016, respectively.  In addition, Sinclair leases aircraft owned by the Smith Brothers for which it incurred expenses of $1.9 million in 2017 and $1.4 million in 2016.

180.     The Smith Brothers have also caused Sinclair to enter into transactions with Cunningham, also controlled by the Smith Brothers, at terms advantageous to Cunningham (rather than Sinclair), including "unconditionally and irrevocably" guaranteeing $45 million worth of Cunningham's debt and purchasing assets and paying various fees to Cunningham totaling at least $28.8 million over the last three years.  The Company owes a further $53.6 million to Cunningham in connection with these asset purchases.  Each of these payments primarily benefited the Smith Brothers or their children but not Sinclair.

181.     The Smith Brothers have previously used Cunningham to engage in sham transactions intended to circumvent FCC regulations.  Cunningham and Sinclair were fined $40,000 by the FCC in connection with the acquisition of a series of television stations from Sullivan Broadcasting.  The FCC concluded that Cunningham, then known as Glencairn Ltd.,

"passively permitted Sinclair to dictate the terms and conditions of the deal" and was *de facto* controlled by Sinclair. As a result of the transaction, which was ultimately approved, the Smith family owned 100 percent of the voting power of Cunningham and 90 percent of the non-voting equity.

182.    By entering into these transactions to benefit the Smith Brothers, the Smith Brothers breached their duty of loyalty and violated the Code of Ethics. The other Director Defendants, by approving proposals that would benefit the Smith Brothers at the expense of the Company also breached their fiduciary duties to the Company and demonstrated their inability or unwillingness to control the Smith Brothers' self-interested conduct and hold the Smith Brothers accountable for their misdeeds.

**B.    The Board is Incapable of Taking Action to Hold the Smith Brothers Accountable**

183.    Four of the Director Defendants, the Smith Brothers, are controlling shareholders of Sinclair and exercise control over Sinclair.

184.    Together, the Smith Brothers beneficially own 96.5% of the Class B Stock and 28.5% of the Class A Stock, representing 75.6% of the total voting power in Sinclair. In addition to direct ownership, the Smith Brothers control various entities that hold shares of Common Stock. As a result of their ownership, they control all routine shareholder votes, including votes for the members of the Board of Directors.

185.    Based on the foregoing, Sinclair admits it is a "Controlled Company" under NASDAQ listing guidelines and is, therefore, exempt from any requirement that independent directors constitute a majority of the Board.

186.    Because the Smith Brothers occupy four of the Company's eight Board seats and because the By-Laws require that a majority of the Board must vote in favor of a proposal before

6687199.1

it can pass, the Board is structurally incapable of approving a measure that is opposed by the Smith Brothers – such as a proposal to hold the Smith Brothers accountable for the breaches of fiduciary duty alleged herein.

187.     In addition to the Smith Brothers, Defendant Daniel Cavanaugh Keith has served as a Director of the Company since May 2001.  Mr. Keith is also the President and Founder of the Cavanaugh Group, Inc., a Baltimore-based investment advisory firm founded in October 1995.  Defendant Keith and his firm have been advising clients since 1979 and have served as an investment advisor to the Smith Brothers, Sinclair's controlling shareholders.  These financial entanglements render Defendant Keith incapable of considering, in good faith, a measure to hold the Smith Brothers accountable to the Company.

188.     Similarly, Defendant McCanna was a shareholder of the accounting firm of Gross,

Mendelsohn & Associates, P.A. from 1972 and served as its managing director through June 30, 2009. Mr. McCanna has provided accounting, tax, and related services to the Smith family and corporations owned by them (other than Sinclair) for many years.

**C.     Demand Is Futile**

189.     As a consequence of the facts alleged herein, the Director Defendants, including the Smith Brothers, face a substantial likelihood of liability for breaching their fiduciary duties to the Company and would therefore be incapable of impartially considering a demand to commence this lawsuit.

190.     In light of the Smith Brothers' advancement of self-interested divestment proposals in contrast to the FCC's clear guidance, they were so committed to making those decisions that they allowed the Merger to fail despite the Company's "best efforts" obligations

-52-

under the Merger Agreement.  In light of this, they cannot reasonably be expected to respond to a demand in good faith.

191.    Moreover because of their affirmative actions to benefit themselves at the expense of the Company, the Smith Brothers are so personally and directly conflicted with respect to a determination of whether Sinclair should initiate litigation against them that they cannot reasonably be expected to consider a demand in good faith.

192.    Because no action to hold the Smith Brothers could be taken without their affirmative assent, demand is futile.

193.    In addition, because each of the Director Defendants was selected and elected to the Board by the Smith Brothers, at least Defendants McCanna and Keith have significant personal financial ties to the Smith Brothers and Sinclair, and the Director Defendants have repeatedly agreed to proposals that would benefit the Smith Brothers at the expense of the Company, they have breached their fiduciary duties to the Company and were so committed to making those decisions that that they allowed the Merger to fail.  In light of this, they cannot reasonably be expected to respond to a demand in good faith.  Further, because they face a substantial likelihood of liability for breaching their fiduciary duties to the Company, they would be incapable of impartially considering a demand to commence this lawsuit.

194.    Plaintiff brings this action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty and other breaches by the Defendants.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (Against All Defendants)

-53-

6687199.1

193.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

194.    Each of the Defendants owed and owes fiduciary duties to Sinclair and its stockholders.  By reason of their fiduciary relationships, Defendants were specifically required to oversee the implementation of the Merger Transactions: (i) in good faith; (ii) in a manner they reasonably believed to be in the best interests of the corporation; and (iii) with the care that an ordinary prudent person in a like position would use under similar circumstances.

195.    Each of the Defendants consciously and deliberately breached these fiduciary duties as detailed above.

196.    Defendants individually, and in concert, caused the Company to evade media concentration rules by (among other things) attempting to transfer certain Company assets to entities affiliated with Sinclair's controlling family, the Smith Family—resulting in a breach of the Merger Agreement.

197.    The Officer Defendants also took steps to propose misleading divestiture plans to the FCC and DOJ and acted antagonistically towards those agencies, making it even more unlikely that the Merger would be approved.

198.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.  Rather they were actions of self-interest by the Smith Brothers and actions to benefit the Smith Brothers by the Director Defendants and the Officer Defendants.

199.    Defendants conspired to abuse, and did abuse, the control, responsibilities and duties vested in them by virtue of their positions at the Company.

6687199.1

200.   As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Sinclair has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

### SECOND CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

201.   Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

202.   From October 2016 through the present (the "Relevant Period"), Defendants received bonuses, stock options, stock, or similar compensation from Sinclair that were unjust in light of Defendants' bad faith conduct, breaches of the duty of loyalty, breach of the Code of Ethics, and self-dealing.

203.   Each of the Defendants knew that he was receiving these benefits from the Company, even while he was taking active steps in breach of the duties that they owed to Sinclair.

204.   Plaintiffs, as shareholders and representatives of Sinclair, seek restitution from Defendants and seek an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

**A.**   A determination that this action is a proper derivative action maintainable under the law and that demand was improperly refused or futile;

**B.**   Declaring that Defendants have breached their fiduciary duties to Sinclair;

**C.**   Determining and awarding to Sinclair the damages sustained by it as a result of

6687199.1

the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

      D.    Directing Sinclair to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from the type of damaging events described in this Complaint, including putting forward for a stockholder vote, of only the Company's Class A shares, resolutions for amendments to the Company's by-laws or articles of incorporation, and taking such other actions as may be necessary to place before stockholders for a vote the following corporate governance policies:

      1.    A proposal to strengthen the Board's supervision of operations and to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

      2.    A proposal to permit the stockholders of Sinclair to nominate at least a majority of Sinclair's Board;

      E.    Equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiffs, on behalf of Sinclair, have an effective remedy;

      F.    Awarding to Sinclair restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

      G.    Ordering an accounting of all compensation awarded to Defendants during the Relevant Period;

      H.    Awarding to Plaintiffs costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

      I.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: December 21, 2018

/s/ Cyril V. Smith
Cyril V. Smith (Federal Bar No. 07332)
ZUCKERMAN SPAEDER LLP
100 E. Pratt Street, Suite 2440
Baltimore, Maryland  21202
Tel: (410) 949-1145
Fax: (410) 659-0436
E-Mail: csmith@zuckerman.com

BERMAN TABACCO
Leslie R. Stern
Nathaniel L. Orenstein (*pro hac vice* forthcoming)
One Liberty Square
Boston, Massachusetts  02109
Tel: (617) 542-8300
Fax: (617) 542-1194
E-Mail: norenstein@bermantabacco.com

6687199.1

## VERIFICATION OF KATHLEEN KIELY-BECCHETTI

1.      My name is Kathleen Kiely-Becchetti. I am the Executive Director for the Norfolk County Retirement System ("Norfolk") and am authorized to act on its behalf in this matter.

2.      This verification is submitted in connection with the filing of a Verified Complaint (the "Complaint").

3.      Norfolk is a beneficial owner of Sinclair Broadcast Group, Inc. ("Sinclair") Class A common stock and has been a continuous beneficial holder of Sinclair Class A common stock since prior to April 19, 2017.

4.      I verify that I have reviewed the foregoing Complaint, and that the allegations as to me and my own actions are true and correct, and all other allegations upon information and belief are believed by me to be true and correct.

_Kathleen Kiely-Becchetti_
Kathleen Kiely-Becchetti

I, the undersigned, a Notary Public in and for the Commonwealth do hereby certify that Kathleen Kiely-Becchetti personally appeared before me, who being by me first duly sworn, does hereby depose and state under oath that she has read the foregoing Verification and that the facts and statements therein contained are true and correct and that she acknowledged to me that she executed the same in her authorized capacity and that by her signature on the instrument, she has executed the instrument.

GIVEN under my hand and official seal of office this _____, 2018.

Notary Public