**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **FIRE AND POLICE RETIREE** | * | |
| **HEALTH CARE FUND,** | * | **Civil Action No. CCB-18-3670** |
| **SAN ANTONIO**, *et. al.* | * | |
| | * | |
| **v.** | * | |
| | * | |
| **DAVID D. SMITH,** *et al.* | * | |
| | * | |
| | * * * | |

**MEMORANDUM**

Now pending and ready for resolution in this consolidated shareholder derivative action is the plaintiffs' motion for final approval of settlement, fee award, and incentive awards (ECF 94). A hearing on the matter was held on October 27, 2020. For the reasons stated herein, the motion will be granted in part and denied in part. The settlement will be approved, the incentive awards will be approved, the expenses will be approved, and the fee award will be approved, but in a reduced amount of $7.4 million.

**FACTS AND PROCEDURAL HISTORY**

Sinclair Broadcast Group, Inc. ("Sinclair") is a telecommunications company and the largest owner of local television stations in the country. Though the company has thousands of shareholders, it is a closely held corporation in which founder Julian Smith's four sons exercise significant control. Together, the four Smith brothers, defendants David D. Smith, Frederick G. Smith, J. Duncan Smith, and Robert E. Smith, comprise fifty percent of Sinclair's Board of Directors and control approximately seventy-five percent of shareholder votes.

In 2017, Sinclair agreed to acquire Tribune Media Company ("Tribune") in a $3.9 billion merger. The merger agreement required Sinclair to divest certain television stations to independent third parties in order to obtain Federal Communications Commission ("FCC") and

Department of Justice ("DOJ") approval.  Sinclair proposed multiple divestitures to companies and individuals with close ties to the Smith family.  After the FCC found a substantial and material question of fact as to whether Sinclair misrepresented material facts in its attempt to consummate the merger with Tribune, the FCC voted to refer the proposed merger to an Administrative Law Judge.  Thereafter, Tribune pulled out of the merger and sued Sinclair in the Delaware Chancery Court alleging breach of contract and claiming damages in excess of $1 billion.  Sinclair ultimately settled the Tribune lawsuit for $60 million, paid a $48 million fine to the FCC, and entered into a consent decree with the FCC imposing certain disclosure, reporting, and training requirements on Sinclair.  At the center of the consent decree was a requirement to hire a Chief Accounting Officer to implement new compliance procedures, oversee the compliance training of relevant personnel, and to submit compliance reports to Sinclair's Board of Directors and to the FCC.

This case involves two consolidated shareholder derivative actions brought by Fire and Police Retiree Health Care Fund, San Antonio and Norfolk County Retirement System on behalf of Sinclair in the aftermath of the failed Tribune merger and the FCC consent decree.  The plaintiffs allege the defendant members of Sinclair's Board of Directors breached fiduciary duties.  Sinclair filed a motion to dismiss, which this court denied on December 9, 2019. Thereafter, the parties engaged in mediation and settlement talks.  As a result, the parties reached a tentative settlement wherein the defendants would be released from liability in exchange for (1) a monetary settlement of $24.86 million, $4.36 million of which would be contributed by defendant David D. Smith and $20.5 million of which would be funded by Sinclair's insurance carriers, and (2) a promise to enact corporate governance reforms targeted at preventing a recurrence of the kinds of problems that led to the failed Tribune merger.  The corporate

governance reforms center around a promise to create a Regulatory Committee of the Board of

Directors to facilitate communication between the new Chief Accounting Officer and the Board

of Directors at large and to "strengthen Sinclair's internal controls, enhance communication . . .

[and] ensure greater independence."  (ECF 94-1, Pl.'s Mem. in Support of Mot. for Final

Approval, at 25–28, 30).  But they also include: the creation of a Nomination and Corporation

Governance Committee to "ensure that the Board is comprised of qualified, and when

appropriate, independent directors"; the appointment of a Chief Compliance Officer to develop

the company's compliance program; revisions to the corporation's policies concerning

transactions with related persons; and revisions to the corporations' Code of Business Conduct

and Ethics.  (*Id.* at 27–28).

On July 23, 2020, the plaintiffs moved for preliminary approval of the proposed

settlement.  On August 6, 2020, this court granted the motion for preliminary approval, ordered

that the plaintiffs provide notice to shareholders in a number of ways, and scheduled a fairness

hearing.  The plaintiffs have issued notice and no objections to the settlement have been

recorded.  On September 15, 2020, the plaintiffs moved for final approval of the proposed

settlement.  The court held a fairness hearing on the final approval on October 27, 2020, and the

matter is now ready for resolution.

## ANALYSIS

## I.  PROPOSED SETTLEMENT

Federal Rule of Civil Procedure 23.1 provides that a derivative action "may be settled,

voluntarily dismissed, or compromised only with the court's approval."  This occurs in two

stages.  First, at the preliminary approval stage, the court's role is to determine whether there

exists probable cause to submit the proposal to members of the class and to hold a full-scale

hearing on its fairness.  *Erny on behalf of India Globalization Capital, Inc. v. Mukunda*, No. DKC-18-3698, 2020 WL 3639978, at *1 (D. Md. July 6, 2020).[1]  At that stage, the crucial inquiry is "whether the proposed settlement is fair, adequate, and reasonable."  *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983) (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir. 1981)).[2]  At the final approval stage, the standard and the factors to be considered are "exactly the same" as during the preliminary approval stage.  *Erny*, 2020 WL 3639978, at *2.  Courts in this circuit typically bifurcate this analysis by inquiring first into the fairness and then into the adequacy of the proposed settlement. *See id.* at *2–3; *Mid-Atlantic Toyota*, 564 F. Supp. at 1383.

### A.  Fairness

The court believes the proposed settlement, which resulted from serious and sustained negotiation, is fair.  To assess the fairness of a proposed settlement, courts must determine that that settlement "was reached as a result of good-faith bargaining at arm's length, without collusion[.]"  *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158–59 (4th Cir. 1991).  This determination requires an examination of (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the particular area of the class action litigation. *See In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020).  The purpose of this inquiry is "to protect against the danger of counsel—who are commonly repeat players in larger-scale litigation—from 'compromising a suit for an inadequate amount for the sake of insuring a fee.'"  *In re Am.*

---

[1] Unpublished opinions are cited for the soundness of their reasoning, not for their precedential value.
[2] Cases involving settlement under Rule 23(e) of nonderivative class actions are relevant by analogy in the derivative context and will be cited herein.  *See* Wright & Miller, 7C Fed. Prac. and Proc. Civ. § 1839 (3d ed.) (updated 2020).

*Capital S'holder Derivative Litig.*, No. 11-2424-PJM, 2013 WL 3322294, at *3 (D. Md. June 28, 2013) (quoting *Mid-Atlantic Toyota*, 564 F. Supp. at 1385).

Nothing in the record before the court even hints at collusion.  Instead, this proposed settlement, which was negotiated separately from and was not conditioned upon approval of the proposed award of attorneys' fees, is clearly the result of arm's length bargaining.  (ECF 94-1 at 36 n.15).  Plaintiffs' counsel spent months participating in negotiations and informal discovery with counsel for Sinclair's Special Litigation Committee ("SLC").  (*Id*. at 18).  They also conducted some formal discovery, and though the scope of discovery was limited, this case featured a fully briefed motion to dismiss and accompanying oral arguments.  (*See* ECF 24; ECF 26; ECF 38; ECF 40; ECF 44; ECF 45; ECF 65).  After surviving the motion to dismiss, counsel participated in mediation sessions with mediator Robert A. Meyer.  (ECF 62; ECF 94-1 at 21– 22).  Following mediation, counsel spent an additional 45 days negotiating the details of the proposed stipulated settlement.  (ECF 94-1 at 37–38).  As a result of their efforts, plaintiffs' counsel secured fairly significant corporate governance reforms and monetary concessions.  (*Id.* at 38).  Finally, the declarations of plaintiffs' counsel establish that they are highly qualified and experienced litigators.  (*See generally* ECF 94-2).  In sum, the proposed settlement was procedurally fair.

### B.  Adequacy

The court believes the proposed settlement, which secures for Sinclair and its stockholders a sizeable monetary award as well as significant governance reforms, is adequate. To determine the adequacy of a proposed settlement, courts must ensure that "the settlement is proportionate to the strength (and weakness) of the plaintiff's case."  *Am. Capital*, 2013 WL 3322294, at *3.  To do this, courts must weigh five factors: (1) the relative strength of the

plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the

plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense

of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a

litigated judgment; and (5) the degree of opposition to the settlement.  *See Lumber Liquidators*,

952 F.3d at 484; *see also Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 679 (D. Md.

2013).

 The first three factors, which all concern the relative strengths and weaknesses of the

plaintiffs' case, weigh in favor of settlement.  The plaintiffs survived a motion to dismiss on the

issue of whether they had satisfied the demand requirement of Fed. R. Civ. P. 23.1, thus

demonstrating some early success.  But further discovery remained to be taken on the status of

the SLC and its composition, and even overcoming the initial demand requirement is no

guarantee of success on the merits.  After all, "[t]he doctrine of demand futility, the business

judgment rule, and the generally uncertain prospect of establishing a breach of fiduciary duties

combine to make shareholder derivative suits an infamously uphill battle for plaintiffs."  *In re*

*Fab Universal S'holder Derivative Litig.*, 148 F. Supp. 3d 277, 281–82 (S.D.N.Y. 2015).  As

plaintiffs' counsel notes, if Sinclair's SLC were to recommend dismissal of this action and if the

court were to decide that the SLC was duly authorized under Maryland law, then the SLC's

choice to dismiss the suit might be protected by the business judgment rule.  (*See* ECF 94-1 at

41).  This would make it very difficult for the plaintiffs to prevail.  And the cost of bringing this

litigation closer to or all the way to trial would be substantial, as a significant amount of

discovery would remain to be done, and further dispositive motions would likely be filed.

Continuing the litigation also would delay, or perhaps even preclude, the implementation of the

substantive corporate governance reforms which the company is otherwise ready to adopt

pursuant to the terms of the proposed settlement.  *See Fab Universal*, 148 F. Supp. 3d at 282 ("A number of risks are posed by continued litigation, while settlement assures broad corporate reform.").

Next, the fourth factor is relatively neutral.  The monetary portion of the settlement ($24.86 million) would not make Sinclair insolvent, as it would be satisfied by insurance proceeds and by contributions from defendant David D. Smith.[3]  The plaintiffs speculate that an award of damages at trial would constitute a greater demand on Sinclair's insurance coverage and could make it difficult to fulfill a judgment.  (ECF 94-1 at 44).  Finally, and significantly, this proposed settlement remains unopposed.  "The complete lack of shareholder objection to this settlement weighs in favor of approval."  *Fab Universal*, 148 F. Supp. 3d at 282; *see also Lumber Liquidators*, 952 F.3d at 485–86 (citing cases demonstrating that an objection rate of less than one percent weighs in favor of adequacy).

Accordingly, nothing in the record indicates that this proposed settlement is substantively inadequate or disproportionate to the strengths and weaknesses of the plaintiffs' case.

### C.  Notice

The court finds that notice of the proposed settlement was adequate.  Federal Rule of Civil Procedure 23.1 requires that "[n]otice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders . . . in the manner that the court orders."  And due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of [an] action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

---

[3] The court notes that personal contributions from directors, so rarely obtained, are significant.  *See* T. Joo, *Corporate Hierarchy and Racial Justice*, 79 ST. JOHN'S L. REV. 955, 966 n.38 (2005).  This fact provides additional support for the adequacy of the settlement.

This court ordered that notice to stockholders was to be provided by several methods: (1) Sinclair was to disclose the terms of the Settlement by filing a Form 8-K with the SEC; (2) Sinclair was to post the Notice and Stipulation on Sinclair's website; (3) Sinclair was to release the Notice and Stipulation on a nationally recognized newswire; and (4) plaintiffs' lead counsel was to post the Notice and Stipulation on their respective websites.  (ECF 91, Preliminary Approval Order, ¶ 7).

The parties complied with the court's requirements: the notice and stipulation was, on August 10, 2020, filed via a Form 8K with the SEC, published in a press release on PR Newswire, and posted on the Investor Relations sections of Sinclair's corporate website as well as on plaintiffs' counsel's websites.  (*See* ECF 94-2, Smith Decl., ¶¶ 46–47).  The notice adequately summarized the terms of the proposed settlement in a manner that would allow those who opposed it to lodge an objection.  (*See* ECF 94-1 at 34–35).  Finally, the deadline for filing objections was September 29, 2020, affording any interested party fifty days to learn of the proposed settlement and file an objection.  (*See* ECF 91 ¶ 8).  This notice regime is substantially similar to the one approved in *In re India Globalization Capital, Inc., Derivative Litig*.  No. DKC-19-3698, 2020 WL 2097641, at *4 (D. Md. May 1, 2020).  Accordingly, notice was issued in the manner ordered by the court and was reasonably calculated to afford interested parties an opportunity to present their objections.

\*\*\*

For the reasons just described, the court finds that the settlement is fair, adequate, and reasonable, and that notice was sufficient.  The proposed settlement will be approved.

## II.  ATTORNEYS' FEES

"It is for the district court in the first instance to calculate an appropriate award of attorney's fees." *Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 628 (4th Cir. 1995).  Though the Fourth Circuit Court of Appeals has not announced a preferred method for calculating an award of attorneys' fees in common fund class actions, courts in this circuit generally use a percentage of recovery method, which may be cross-checked by the lodestar method.  *See Singleton,* 976 F. Supp. 2d at 681.

In this case, the plaintiffs seek an $8.167 million award to be paid out of the $24.86 million settlement fund and to cover their attorneys' fees, their litigation expenses, and the plaintiff incentive awards.  (ECF 94-1 at 46–47; ECF 89-2, Stipulation, ¶ 18).  Across all firms, plaintiffs' counsel invested 3,865.9 hours for a total lodestar of $2,449,656.50, plus expenses of $71,355.89.  (ECF 94-1 at 58; ECF 94-2 at 40).  Deducting from the total fee award the reasonable litigation expenses of $71,355.89, the plaintiffs seek attorneys' fees totaling $8,095,644.11.  Putting aside for now the uncertain value of the corporate governance reforms, the attorneys' fees sought by the plaintiffs represents 32.6 percent of the settlement fund, or a lodestar multiplier of 3.30.  The court will consider the reasonableness of this proposed award under a percentage of recovery method with a lode-star cross-check.

### A.  Percentage of Recovery Method

Attorneys' fees awarded under the percentage of recovery method are often between 25 percent and 30 percent of the value of the common fund.[4]  Ann. Manual for Complex Litigation § 14.121 (4th ed.); *see also Singleton*, 976 F. Supp. 2d at 684.  Courts in this circuit have analyzed the following seven factors from *Singleton v. Domino's Pizza* to determine the

---

[4] The plaintiffs cite a range of awards in the Fourth Circuit between fifteen and forty percent.  (*See* ECF 94-1 at 53).

reasonableness of a fee award using a percentage of the recovery method: (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys involved; (3) the risk of nonpayment; (4) objections by members of the class to the settlement terms and/or fees requested by counsel; (5) awards in similar cases; (6) the complexity and duration of the case; and (7) public policy.  976 F. Supp. 2d at 682; *see also Kelly v. Johns Hopkins Univ.*, No. 16-cv-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).  Notably, though, fee award reasonableness factors need not be applied in a formulaic way because each case is different— and in certain cases, one factor may outweigh the rest.  *Singleton*, 976 F. Supp. 2d at 682.

### 1.  Results Obtained

Here, the $24.86 million recovery, in addition to the corporate governance reforms, is an excellent result for the corporation.  The monetary recovery represents nearly a quarter of the readily quantifiable money damages arising out of the failed Tribune merger, which resulted in litigation that Sinclair settled for $60 million and an FCC fine that cost Sinclair another $48 million.  While more potentially could have been gained had plaintiffs' counsel brought this case to trial, all could have just as easily been lost.  And the corporate governance reforms provide a five-year guarantee that a Regulatory Committee, a majority of whose members will be independent directors, will help to prevent a recurrence of the conduct which led to this litigation.  Further, this litigation has resulted in the creation of a new Nomination and Corporation Governance Committee, as well as the appointment of former Judge Benson E. Legg to the SLC and to Sinclair's Board, thus shoring up the Board's independence.

### 2.  Quality of Counsel

Plaintiffs' attorneys are experienced and skilled litigators with substantial experience in shareholder derivative actions, as their resumes and biographies readily demonstrate.  Plaintiffs'

counsel spent nearly 4,000 hours over the course of two years to investigate, litigate, and settle this case, all while opposing sophisticated and experienced defense attorneys.  "[S]ettlement was reached relatively quickly," which "further indicates the attorneys' skills[.]"  *Singleton*, 976 F. Supp. 2d at 683.

### 3.   *Risk of Nonpayment*

"[C]ourts consider the relative risk involved in litigating the specific matter compared to the general risks incurred by attorneys taking on class actions on a contingency basis."  *Id.*  This includes consideration of "the presence of government action preceding the suit, the ease of proving claims and damages, and if the case resulted in settlement, the relative speed at which the case was settled."  *Id.*  Here, the plaintiffs benefitted from significant government action preceding the suit: an FCC hearing designation order finding a material question of fact as to whether Sinclair made misrepresentations in its merger bid and a subsequent FCC fine and consent decree.  Additionally, given the FCC's monetary recovery and the value of the Tribune settlement, there were readily provable damages of $108 million.  Still, plaintiffs' counsel correctly note that a number of obstacles stood in their way—in particular, preventing Sinclair's SLC from terminating the case and overcoming Maryland's business judgment rule—in addition to the difficulties of proving their case on the merits.  (*See* ECF 94-1 at 58–59).  While there is always risk in fronting the costs of litigation and working on contingency, and while the government by no means did all the heavy lifting for plaintiffs' counsel, the risk of nonpayment was no more serious here than in most other derivative actions, where counsel inevitably must contend with the same demand requirements and business judgment presumptions.  Indeed, given the significant government action that preceded this litigation, it may have been slightly less risky.

### 4. Objections

A "lack of objections tends to show that . . . the requested fee is reasonable for the services provided and the benefits achieved[.]" *Singleton*, 976 F. Supp. 2d at 684.  In this case, there have been no objections to the proposed fee award.

### 5. Awards in Similar Cases

"In considering awards in similar cases, courts look to cases of similar size rather than similar subject matter." *Singleton*, 976 F. Supp. 2d at 685; s*ee also In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737 (3d Cir. 2001).  "It would be nearly impossible for this Court . . . to evaluate hundreds of class action settlements and come up with a median or average fee amount in similar cases[,]" but thankfully "legal scholars have already gathered this kind of empirical data." *Loudermilk Servs., Inc. v. Marathon Petroleum Co.*, 623 F. Supp. 2d 713, 723 (S.D. W. Va. 2009).  One such study found that in cases without a fee-shifting mechanism, "the axiomatic one-third fee is inaccurate" and "a fee of 20 to 25 percent of the recovery better describes reality."  Eisenberg & Miller, *Attorneys Fees in Class Action Settlements: An Empirical Study*, 1 J. Emp. L. Studies, 50 (2004); *see also Stoner v. CBA Info. Servs.*, 352 F. Supp. 2d 549, 553 (E.D. Pa. 2005) (noting fee awards have ranged from 15 percent to 40 percent in cases that settled for under $100 million).  In a follow-up study, the same authors found that for settlement funds valued between $22.8 million and $38.3 million, the mean attorneys' fees award was 22.1 percent.  Eisenberg & Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Emp. L. Studies 248, 265 T.7 (2008).  Even in jurisdictions which presume a 33 percent recovery is reasonable, in the class action and derivative action context, where counsel has more control over the litigation and where the potential reward for counsel is much higher, a reduction from 33 percent may be justified.  *See, e.g., Loudermilk Servs.,* 623 F. Supp. 2d at

723–24 (relying in part on empirical studies of similar actions to justify a reduction from the

state's 33 percent benchmark to 25 percent in an action that secured a settlement fund worth

between $15 million and $25 million).  In this case, though the plaintiffs identify several

instances where a percentage of recovery of 30 percent to 40 percent has been awarded, there is

nevertheless a large discrepancy between the nearly 33 percent recovery sought by plaintiffs'

counsel and the mean of 22.1 percent in similarly sized actions.

Determining the reasonableness of the proposed percent of recovery in this case is

complicated by the fact that the settlement at issue here includes not only a $24.86 million

settlement fund but also corporate governance reforms of uncertain economic value.  Though the

plaintiffs request the court to value the corporate governance reforms at anywhere from $15

million to $25 million, the court can discern no principled basis on which to accept such a

valuation.  It is true that the caselaw is replete with attorneys' fee awards that are based on non-

monetary settlements, but many of those cases determined a reasonable fee award either through

a lodestar calculation or with the aid of expert testimony on the valuation of corporate

governance reforms.  *See, e.g.*, *In re Schering-Plough Corp. S'holders Derivative Litig.*, No. 01-

1412, 2008 WL 185809, at *4 (D.N.J. Jan. 14, 2008) (noting that since the settlement did not

produce a common fund, the court "must employ the lodestar method to determine the

reasonability of the proposed fee award" and approving a multiplier of 1.37); *In re Force*

*Protection, Inc. Derivative Litig.*, No. 2:08-1907-CWH, 2012 WL 12985420, at *10 (D.S.C.

Mar. 30, 2012) (featuring the testimony of a corporate governance expert, which was ultimately

unhelpful in resolving the considerably difficult problem of valuing corporate governance

reforms).  In this case, there was no expert testimony.  Nor is it possible for the court to segregate

the hours that plaintiffs' counsel worked on securing corporate governance reforms from the

hours that plaintiffs' counsel worked on securing a monetary settlement to perform a lodestar calculation.  Thus, while the court is convinced that the corporate governance reforms are of significant value, it is not prepared to place a specific monetary value on the reforms.  As a result, even though the court finds that the 32.6 percent recovery sought is at the high end of the range and deviates significantly from the mean, this must be balanced against the collective weight of the corporate governance reforms and the monetary settlement.

### 6.  *Complexity of the Case*

In evaluating the complexity and duration of a case, courts consider "not only the time between the filing of the complaint and reaching settlement, but also the amount of motions practice prior to settlement, and the amount and nature of discovery."  *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 761 (S.D. W. Va. 2009).  "Where discovery is informal and does not involve conflicts over privilege or access to documents, the case is less complex and time consuming."  *Id.*  "The case is more complex when the applicable laws are new, changing, or unclear."  *Id.* at 762.  And "[i]n a settlement context, courts may look to whether negotiations were hard fought, complex, or arduous."  *Id.* (internal quotations omitted).  In this case, plaintiffs' counsel briefed and argued a motion to dismiss, which forced them to contend with the thorny issue of Rule 23.1's demand requirement.  Though counsel asserts that demand futility, the business judgment rule, and the uncertain prospect of establishing a breach of fiduciary duties combined to make the case very complex, the motion to dismiss focused on only one of these issues.  (ECF 94-1 at 61).  Discovery was conducted in this case, which did involve adversarial disputes and the production of privilege logs, but it was largely limited to the issue of the validity of Sinclair's SLC.  (*See* ECF 67).  And the negotiations in this case appear to have been fairly hard-fought.  Thus, while the motions practice and discovery were somewhat limited

relative to the issues that may have been presented by the litigation as a whole, this is offset by the fact that settlement was nevertheless contentious.

### 7. Public Policy

The reasonableness of a fee award must be determined with respect to competing public policy concerns: courts need to strike a balance between encouraging "attorneys [to] continue litigating class action cases that 'vindicate rights that might otherwise go unprotected,' and perpetuating the public perception that 'class action plaintiffs' lawyers are overcompensated for the work that they do.'" *Singleton*, 976 F. Supp. 2d at 687 (quoting Third Circuit Task Force Report, 208 F.R.D. 340, 342 (Jan. 15, 2002)). Because of the damage caused by the perception that plaintiffs' attorneys receive too much of the funds set aside to compensate victims, lawyers requesting attorneys' fees and judges reviewing those requests must be vigilant "to ensure the fees are in fact reasonable beyond reproach and worthy of our justice system." *Jones*, 601 F. Supp. 2d at 765. In this case, plaintiffs' counsel secured an excellent settlement that includes significant corporate governance reforms that would not have resulted from a trial on the merits. But the court is also aware that a fee award of $8.167 million—nearly a third of the total recovery—may appear unseemly to the general public, even if it appears reasonable to the bar. Based on these competing concerns, "a nominal reduction in the requested fee award is sufficient to account for the [litigation] risks . . . counsel identifies while continuing to promote the policy goals" of encouraging corporate governance reform and "protecting against excessive fees." *Singleton*, 976 F. Supp. 2d at 688.

***

In sum, the court finds that the results obtained here, including the significant corporate governance reforms that would not have been obtained through trial, are excellent. The court

also finds that skilled counsel worked both efficiently and effectively to reach the settlement in this case.  Although this weighs in favor of the proposed award, other factors weigh against such a high award: in particular, awards in similar cases have not been quite as high as the plaintiffs have requested in this case, and government action preceding this litigation provided the plaintiffs with both a strong foothold on which to commence this litigation and significant leverage for settlement.  In light of the foregoing analysis, the court is inclined to approve an award of attorneys' fees slightly lower than the amount the plaintiffs have requested, subject to a lodestar cross-check.

### B.  Lodestar Cross-check

The purpose of performing a lodestar cross-check is "to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether it is within some reasonable multiplier of the lodestar."  *Singleton*, 976 F. Supp. 2d at 688.  Where a lodestar is used as a mere cross-check to the percentage of recovery method, "the hours documented by counsel need not be exhaustively scrutinized by the district court."  *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 385 (D. Md. 2006) (quoting *In re Worldcom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005)); *see also Jones*, 601 F. Supp. 2d at 765–66.

Here, a lodestar cross-check confirms that the proposed fee award is slightly high.  Plaintiffs' counsel claim a lodestar of $2,449,656.60 based on 3,865.9 billable hours.  (*See* ECF 94-1 at 58).  The court, for the purposes of the cross-check, accepts those hours and will not scrutinize them.  To arrive at the $8,095,644.11 fee award sought by plaintiffs' counsel requires a lodestar multiplier of 3.30.  In this district, courts have found lodestars falling between 2 and 4.5 to be reasonable, *see Singleton*, 976 F. Supp. 2d at 689, but there are also cases where lodestars lower than 2, or even fractional lodestars, have been awarded, *see Erny*, 2020 WL

3639978, at *5 (approving a fractional award of $200,000 where the lodestar was over $390,000); *Cendant*, 243 F.3d at 742 (noting cases with multipliers between 1.35 and 2.99). Accordingly, reducing somewhat the lodestar multiplier of 3.30, which sits at the higher end of the range, would be consistent with the reduction suggested by the percentage of recovery analysis above. *See Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 471 (S.D. W. Va. 2010) (stating that a lodestar multiplier between 2.8 and 3.4—less than counsel had requested—was well within the reasonable range and "undoubtedly high enough to encourage future class action representation and efficient, collegial conduct by attorneys").

***

An award of $7.4 million in attorneys' fees, representing a percentage of recovery just under 30 percent of the value of the settlement fund and a lodestar multiplier of just over 3.0, is high enough to encourage meritorious litigation in this area and to adequately compensate counsel for their efforts, while also mitigating against the public perception that attorneys' fees too often diminish the recovery to injured parties. Accordingly, the court will approve an award of $7.4 million in fees, plus the value of the reasonable litigation expenses incurred, for a total of $7,471,355.89.

## III.    INCENTIVE AWARDS

The court finds that the proposed incentive awards are reasonable. In considering whether an incentive payment to named plaintiffs in a derivative action is warranted, courts should consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Erny*, 2020 WL 3639978, at *6 (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)). An incentive award may be warranted where the

plaintiffs have spent time and money "to procure significant corporate governance reforms which will benefit all shareholders, not just themselves." *Id.*

In this case, the fee award sought includes $5,000 incentive awards for each named plaintiff. (ECF 94-1 at 70; ECF 89-2 ¶ 18). Without the participation of these sophisticated institutional plaintiffs, it is not likely that a significant recovery benefitting all of Sinclair's shareholders would have materialized. A $5,000 incentive award appears to be in line with other incentive awards approved in this circuit. *See, e.g.*, *Erny*, 2020 WL 3639978, at *6 (approving $1,000 incentive awards for named plaintiffs in the context of a settlement securing corporate governance reforms); *Singleton*, 976 F. Supp. 2d at 690–91 (approving $2,500 incentive awards for named plaintiffs in the context of a settlement securing a $2.5 million common fund); *Jones*, 601 F. Supp. 2d at 767–68 (awarding $15,000 to each named plaintiff in the context of a settlement securing a fund worth over $40 million). Further, "because the [incentive] award is to be paid out of the award of attorneys' fees, it 'need not be subject to intensive scrutiny, as the interests of the corporation, the public and the defendants are not directly affected.'" *Erny*, 2020 WL 3639978, at *6 (quoting *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002)). Therefore, the incentive awards are appropriate in this case and will be approved.

**CONCLUSION**

For the reasons stated herein, the settlement will be approved. Further, the requested expenses of $71,355.89 will be approved, and a total of $7.4 million in attorneys' fees, from which the incentive awards will be paid, will also be approved. A separate order follows.

  11/20/20                                          /S/
Date                                         Catherine C. Blake
                                             United States District Judge